William E. GROSECLOSE

v.

Ricky BELL, Warden.

No. 3:89–0662.

United States District Court,
M.D. Tennessee,
Nashville Division.

July 28, 1995.

Larry D. Woods, Woods & Woods, Nashville, TN, for petitioner.

Glenn Richard Pruden, Nashville, TN, for respondent.

### MEMORANDUM

JOHN T. NIXON, Chief Judge.

In this habeas corpus proceeding under 28 U.S.C. § 2254, Petitioner William Edward Groseclose challenges the constitutionality of his 1978 conviction and sentence of death by electrocution imposed by the Criminal Court of Shelby County, Tennessee. Mr. Groseclose was tried and convicted in February of 1978 for murder in the first degree for the murder of his wife, Deborah Lee Groseclose. Commencing at 10:00 a.m. on April 10, 1995, the Court conducted an evidentiary hearing on Mr. Groseclose's claims challenging the constitutionality of his conviction for first-degree murder. Based upon the evidence in the record, the Court makes the following findings of fact and conclusions of law, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. *Procedural History*

1. In late February of 1978, Petitioner Groseclose was tried and convicted for murder in the first degree for the death of his

wife.[1] After Groseclose was convicted and sentenced to death he appealed to the Tennessee Supreme Court, the court affirmed Groseclose's conviction and sentence on February 17, 1981. *State v. Groseclose & Rickman*, 615 S.W.2d 142, 150 (Tenn.1981). On February 27, 1981, the Tennessee Supreme Court denied a petition for rehearing. *Id.* at 142. Mr. Groseclose then filed a petition for certiorari to the United States Supreme Court which was denied on October 5, 1981. *Groseclose v. Tennessee*, 454 U.S. 882, 102 S.Ct. 366, 70 L.Ed.2d 193 (1981).

2. Petitioner Groseclose filed his first petition for post-conviction relief in the Criminal Court of Shelby County, Tennessee in January of 1982. The trial court conducted an evidentiary hearing on March 25–26, 1982, and denied his petition on December 5, 1982. Petitioner sought an appeal, and on February 16, 1984, the Court of Criminal Appeals affirmed the judgment of the trial court. Groseclose then filed a petition for rehearing. On July 2, 1984, the Tennessee Supreme Court denied Petitioner's application for permission to appeal. On November 26, 1984, the United States Supreme Court denied Groseclose's petition for the writ of certiorari. *Groseclose v. Tennessee*, 469 U.S. 1066, 105 S.Ct. 549, 83 L.Ed.2d 436 (1984).

3. On March 31, 1986, Petitioner filed his second petition for post-conviction relief. On May 23, 1986, the trial court granted the State's motion to dismiss the petition. On February 25, 1987, the Court of Criminal Appeals entered an opinion affirming the dismissal of the petition without an evidentiary hearing. The Tennessee Supreme Court subsequently denied Petitioner's application for permission to appeal that judgment.

4. In June 1989, Petitioner filed his third petition for post-conviction relief, which the trial court dismissed. On March 6, 1991, the Court of Criminal Appeals entered an opinion affirming the dismissal of the petition. On September 9, 1991, the Supreme Court of Tennessee denied Petitioner's application for permission to appeal that judgment.

5. In September 1992, Petitioner filed a petition for a state writ of habeas corpus. On January 24, 1994, the Criminal Court of Tennessee, Thirteenth Judicial District, denied the petition.

6. Petitioner filed the instant petition for writ of habeas corpus on August 15, 1989, under 28 U.S.C. § 2254, challenging the legality of his confinement and death sentence. (Pet. Habeas Corpus, Doc. No. 2.) Petitioner's execution was scheduled for August 23, 1989. By Order entered on August 23, 1989, this Court granted a stay of execution of Groseclose's death sentence. (Ord., Doc. No. 8.)

7. Respondent filed two motions for judgment on the pleadings with respect to procedural default issues. By Order entered November 8, 1994, the Court denied respondent's motions for judgment on the pleadings. (Ord., Doc. No. 128.)

8. On January 13, 1995, Petitioner filed a motion for summary judgment as to several of his claims. By Order entered April 5, 1995, the Court granted in part, denied in part, and dismissed in part Petitioner's motion for summary judgment. (Ord., Doc. No. 184.) However, the Court, at that time, reserved judgment as to issuing a writ of habeas corpus because Petitioner had other claims to be heard at an evidentiary hearing.

9. On April 10, 1995, the Court conducted an evidentiary hearing on the remainder of Petitioner's claims. Petitioner challenges the constitutionality of his conviction for first-

---

1. William Groseclose was convicted of hiring Ronald Eugene Rickman to kill his wife, Deborah Groseclose. The victim, a twenty-four year old Memphis medical receptionist, was raped twice, strangled into unconsciousness, stabbed three or four times in the back, kidnapped from her home, and left locked in the trunk of her automobile parked at the downtown Memphis library in the broiling sun from about 9:00 a.m. on June 29, 1977 until her badly decomposed body was discovered some five days later during the early afternoon of July 4, 1977. She died from heat exposure. Both Rickman and Groseclose received the death penalty. Phillip Michael Britt was convicted of helping Rickman commit the crime and was given a life sentence. Barton Wayne Mount was sentenced to ten years, and served four, for being a go-between between Groseclose and Rickman. By Order entered on September 2, 1994, this Court vacated Rickman's conviction for first-degree murder.

degree murder on the basis of the following claims:

(1) Trial attorney Fernand Brackstone rendered inadequate and ineffective assistance of counsel to the prejudice of Petitioner Groseclose, in violation of the Sixth, Eighth, and Fourteenth Amendments;

(2) Violation of due process because grand jury foreman which indicted Petitioner did not represent a cross-section of the community in that blacks and women were systematically underrepresented, which constitutes a violation of the Fifth, Sixth, and Fourteenth Amendments.

(3) Totality of errors and cumulative effect of those errors at Petitioner's trial merit granting habeas relief.

10. Petitioner has not raised, and has therefore waived, the following claims alleged in his habeas corpus petition to challenge the constitutionality of his conviction:

(1) Prejudicial admission of photographs of decomposed body.

(2) Violation of Petitioner's right to confront and cross-examine co-defendant Britt.

(3) Right to fair trial violated because of outside influence and information on jurors.

(4) Unconstitutional jury instructions concerning mitigating circumstances.

B. *Facts Relevant To Claims* [2]

(1) Ineffective Assistance of Counsel

1. This was a case of a murder indictment against four defendants that resulted in the conviction of three and the severance of co-defendant Mount. All the other defendants gave statements implicating Petitioner Groseclose. Mr. Groseclose made no statement except to protest his innocence and consistently advised his trial attorney that he was innocent and did not do it. (PC Tr. 255).

Mr. Groseclose was willing to testify at the guilt phase of his trial as to his innocence. (PC Tr. 256–257). Based upon his trial attorney's advice, Mr. Groseclose did not testify at the guilt phase. (PC Tr. 259–260).

2. The trial attorney that represented Mr. Groseclose was Fernand D. Brackstone who was employed by Mr. Groseclose's mother. (PC Tr. at 199–200). Attorney Brackstone paid one-third of his fee in the matter to attorney Pickens, who had referred Groseclose's mother to him. (PC Tr. 409). Trial attorney Brackstone first met Mr. Groseclose in the Shelby County jail some time after his arrest. (PC Tr. 199–200). At that first meeting, attorney Brackstone told Mr. Groseclose that he was going to investigate the case. (PC Tr. 200). The next time attorney Brackstone and subsequent times that attorney Brackstone saw Mr. Groseclose he never said and never reported what he investigated or what his results were. (PC Tr. 200–201). Attorney Brackstone frequently told Mr. Groseclose that he should just plead guilty and throw himself on the mercy of the court. (PC Tr. 201–202).

3. Petitioner Groseclose spent a total of twelve years in the United States Navy. (PC Tr. 197). He had an excellent disciplinary record in the Navy except for a Captain's mast for a rule violation which was a non-judicial proceeding resulting in an oral reprimand. (PC Tr. 198) (EH Exh. 20). His family lives in Tennessee and Virginia and he is very close to them. (PC Tr. 197). Mr. Groseclose had no prior criminal record before this charge. (PC Tr. 198).

4. Attorney Brackstone never asked Mr. Groseclose about defenses he might have to the charges against him. (PC Tr. 203). When Mr. Groseclose had suggestions about a defense, attorney Brackstone always had some reason why it should not be raised. (PC Tr. 203, 204). Mr. Groseclose specifical-

2. Citations to the record are made as follows:

| | |
|---|---|
| Doc. No. ___ | Federal Court Document Docket Number |
| PC Tr. ___ | State Post–Conviction Transcript, Page |
| PC Exh. ___ | State Post–Conviction Exhibit, Page |
| EH Tr. ___ | Federal Evidentiary Hearing Transcript, Page |
| EH Exh. ___ | Federal Evidentiary Hearing Exhibit, Number |
| St.Ct.Tr. ___ | State Trial Transcript, Page |
| St.Ct.Exh. ___ | State Trial Exhibit, Page |
| Closing Arg. Tr. ___ | State Trial Closing Argument, Page |

ly asked that members of his family be called to testify, but attorney Brackstone didn't think that was a wise idea. (PC Tr. 203). Attorney Brackstone admitted that he never saw family members and couldn't answer whether they were available or not. (PC Tr. 389).

5. Three experts testified at the evidentiary hearing about whether attorney Brackstone met the Sixth and Fourteenth Amendment requirements concerning effective assistance of counsel. Petitioner Groseclose called attorney William J. Marett and attorney Charles W. Fels and counsel for Groseclose cross-examined attorney Thomas Pera, a witness for the respondent, on this issue. Attorney Pera, who represented the co-defendant Britt in the Groseclose trial, was asked whether attorney Brackstone was reasonably effective in representing Mr. Groseclose at trial and answered, "No, he was not effective." (EH Tr. 289). Mr. Pera elaborated his answer by noting that he would have done things that attorney Brackstone did not do, primarily in putting together something to mitigate in case his client was convicted. (EH Tr. 289). In fact, attorney Pera, who had organized and investigated the mitigation evidence for co-defendant Britt who received life imprisonment, testified that attorney Brackstone could have done the exact same thing he did in terms of investigation and preparing for the mitigation stage. (EH Tr. 290). Attorney Pera prepared for mitigation by contacting local experts at Memphis State University to testify. (EH Tr. 290). Attorney Brackstone failed to so prepare and never even asked attorney Pera where he found his expert witnesses. (EH Tr. 291). Attorney Pera could not recall attorney Brackstone in their defense lawyer conferences at trial ever saying anything to the effect that he was working on mitigation evidence, or had a plan for mitigation evidence, or had a strategy for mitigation evidence. (EH Tr. 291). In fact, attorney Pera laughed in surprise when asked if he would have been shocked to have heard something like that from attorney Brackstone. (EH Tr. 291). Attorney Pera confirmed that that was not the kind of performance attorney Brackstone put on during the trial. (EH Tr. 292).

6. Attorney Pera also confirmed, as attorney Brackstone admitted at the post-conviction hearing, that Mr. Brackstone was more or less doing what Mr. Livingston did to represent his client and that he was kind of following Mr. Livingston's lead. (EH Tr. 292). Attorney Pera in fact did not remember Brackstone doing anything really other than what Mr. Livingston did. (EH Tr. 307). Attorney Pera agreed that for this kind of death penalty case in 1978 it was necessary in order to be effective in such cases to have a seasoned trial attorney. (EH Tr. 293).

7. Attorney Brackstone was not a seasoned trial attorney. Attorney Brackstone graduated from law school in 1937 but was not admitted to practice in Tennessee until 1971. (PC Tr. 346). He originally practiced law in Mississippi from 1937 to 1941, was then in the military service, and after World War II went to work for the Veterans Administration handling claims filed against the government until about 1950. Attorney Brackstone then bought his uncle's general merchandise business in Corinth, Mississippi and operated that business until 1956 and then became associated with a "manufacturing outfit" from Falls River, Massachusetts. (PC Tr. 346–349). From 1956 until 1971 Mr. Brackstone did not practice law. (PC Tr. 349–350). From 1971 through the time of Mr. Groseclose's arrest in 1977, attorney Brackstone had four to six criminal cases that actually went to trial by jury. (PC Tr. 351). The Groseclose case was attorney Brackstone's first murder trial in Tennessee. (PC Tr. 352). Before the Groseclose case attorney Brackstone never had a murder case that went to a jury, in any state where he had practiced. (PC Tr. 352). At the post-conviction hearing in 1982, attorney Brackstone was even unclear as to how he came to practice in Tennessee. At first he said he took the Tennessee bar exam in 1970 or 1971. (Pc Tr. 352). Then he changed his mind and said that he did not take the examination but was admitted to practice based on reciprocity. (PC Tr. 352–353). Between 1971 and 1977 attorney Brackstone attended only three or four CLE seminars, and only part of one of those seminars dealt with the defense of murder cases. (PC Tr. 353). Attorney Brackstone from 1971 to 1977 was not

affiliated with any professional legal organizations of criminal defense attorneys and did not take any periodicals that made special reference to criminal defense work. (PC Tr. 354).

8. For expert testimony in the evidentiary hearing, Petitioner Groseclose called expert Charles W. Fels, an attorney from Knoxville, Tennessee who has practiced almost exclusively in the defense of criminal cases for the past ten years. Prior to that time Mr. Fels served eight years as a prosecutor as an Assistant U.S. Attorney and Assistant District Attorney in Knox County, Tennessee. Mr. Fels has been a visiting lecturer for the Federal Bureau of Investigation (FBI) at Quantico for over three years and has been an instructor at the National Criminal Defense College for over seven years. As a defense attorney, Mr. Fels testified he had been involved in both the prosecution and defense of several death penalty cases. (EH Tr. 209–212). Mr. Fels has testified as an expert witness for both the prosecution and the defense in the past. (EH Tr. 212–213).

9. Attorney Charles Fels outlined the steps he considered "normal" in defending a death penalty matter: (1) to form a meaningful and close working relationship with the client; (2) to interview the client carefully and independently investigate all circumstances of the case; (3) to communicate to the client all evidence against him; (4) to determine statutory and non-statutory mitigating circumstances and to prepare witnesses properly before they testify; (5) to file meaningful pre-trial motions; and (6) to object throughout the proceeding in an effort to protect the record against procedural default or waiver. Mr. Fels reviewed the 2,400 page transcript of Petitioner Groseclose's trial (EH Tr. 213), and concluded that in all of these critical areas, trial attorney Brackstone's legal representation was constitutionally deficient. (EH Tr. 215–216).

10. According to Fels, Brackstone failed to perform as a reasonably effective attorney in almost every area. (EH Tr. 216). He only filed five pre-trial motions is a case where "normally effective counsel" would filed "35 to 50" pre-trial motions. (EH Tr. 216). Fels further stated that effective counsel should raise all matters that he or she legitimately can pre-trial. (EH Tr. 238). Of the five pre-trial motions filed, none related to matters of substance and did not challenge the then-new death penalty statute in Tennessee. (EH Tr. 216). There was no *Brady* motion filed. (EH Tr. 216). As attorney William Marett pointed out, the Tennessee death penalty statute was new in the Groseclose case and there would have been many questions about the statute that should have resulted in pre-trial motions. (EH Tr. 101). Attorney Marett also noted that a reasonably effective trial lawyer in Tennessee in 1978 would have filed a motion relating to the composition of the grand jury. (EH Tr. 101).

11. According to Fels, of the 2,400 pages of actual trial testimony, Brackstone made only one independent trial objection. (EH Tr. 218). Attorney Charles Fels stated that he would anticipate in death penalty case of this magnitude that a reasonably effective attorney would have hundreds of grounds for new trial in an effort to protect the record. (EH Tr. 219). Instead, attorney Brackstone filed a motion for new trial which consisted of a mere three grounds. (EH Tr. 219). He then dropped the third ground concerning newly discovered evidence. (EH Tr. 219–220).

12. According to Fels, attorney Brackstone also failed to seek a severance to avoid a sentencing hearing where all the co-defendants would be in conflict and where everyone testifies in ways that are adverse to the interests of others. (EH Tr. 217).

13. Attorney Charles Fels also testified that there was no reasonable possibility of a unified defense or simply following the lead of attorney Livingston in this case because attorney Brackstone's overriding mission should have been to perfect the interests of his own client. (EH Tr. 217–218). By looking to attorney Livingston, attorney Brackstone began the erosive process whereby one abdicates responsibility for his own client. (EH Tr. 218). This was a case where attorney Brackstone should have assumed that the co-defendant's interests were hostile because of the statements they had given. (EH Tr. 241). Attorney William Marett tes-

tified that a joint defense is always risky unless the defendants share the same alibi and even then is not recommended in a death penalty case if there is going to be a sentencing hearing since each lawyer needs to focus on their defendant individually. (EH Tr. 91). This would particularly be true if one defendant were better educated than the other defendants, had no criminal record, and had military service or similar factors. (EH Tr. 91). In a case where the co-defendants gave incriminating statements against your client and your client did not confess or make any guilt admission, then attorney William Marett testified that he would "absolutely not" entertain on any level a joint defense with those co-defendants. (EH Tr. 91–92).

14. Attorney Charles Fels also testified that attorney Brackstone was ill-equipped to defend a case of this kind because he had withdrawn from the practice of law for a number of years, had tried very few trials, none of which were murder cases, and was not a member of any of the professional associations. (EH Tr. 221–222). As a result, attorney Brackstone had no practical experience in such a case and had only minimal training of a professional kind. (EH Tr. 222).

15. Further, attorney Fels was highly critical of attorney Brackstone's losing, misplacing or allowing the destruction of his legal file in this matter. (EH Tr. 220–221). He indicated that it is commonplace for trial counsel to preserve the file in order to pass it on to successor counsel. (EH Tr. 243).

16. Attorney Charles Fels outlined the major problems and major defects or failures of attorney Brackstone resulting in prejudice. (EH Tr. 222). The initial failure was the failure to investigate. (EH Tr. 222). Fels stated that Brackstone's investigation was perfunctory, involved very limited work, and resulted in attorney Brackstone being astonished to have Mr. Groseclose's first statement introduced into evidence because he had simply forgotten that he had seen it before. (EH Tr. 222–223). According to Fels, there was a failure to investigate because attorney Brackstone never interviewed witnesses that concerned the co-defendants who had given incriminating statements

against Mr. Groseclose. (EH Tr. 223). Fels further stated that under such circumstances where the defendant insists upon his innocence, the defense attorney must mount a strict scrutiny of the backgrounds and circumstances of the individuals whose statements incriminate the defendant and conduct an independent investigation in an effort to demonstrate to a jury just why it is those individuals would make those statements. (EH Tr. 223). None of this investigation was done by attorney Brackstone. (EH Tr. 223).

17. The next failure of investigation in this case by attorney Brackstone was his failure to describe the nature of any investigative results to his client. Attorney Brackstone did not describe the evidence against Mr. Groseclose to Mr. Groseclose. (EH Tr. 224). As attorney Brackstone admitted at his post-conviction testimony, the most he ever said about this to Mr. Groseclose was to the effect that the state had a lot of evidence. (EH Tr. 224). Attorney Brackstone admitted that he did not send any correspondence about the case to Mr. Groseclose. (EH Tr. 224). Attorney Brackstone failed to keep open communication with Mr. Groseclose. (EH Tr. 246).

18. Another major element of prejudice at the trial was attorney Brackstone's performance at the sentencing phase. Attorney Brackstone apparently did not comprehend how the mitigation hearing was supposed to be conducted. Again he relied upon Mr. Livingston who represented a defendant with very different interests. He called four witnesses, all of whom cumulatively hurt, not helped the Petitioner. (EH Tr. 229–230). This was "a failure of counsel." (EH Tr. 250). Attorney Brackstone failed in cross-examination concerning the Captain's Mast which first came up only because attorney Brackstone called Mr. Penley as a witness. (EH Tr. 231). Attorney Brackstone did not call Mr. Groseclose as a witness during the guilt phase, which he could have done since Mr. Groseclose repeatedly told him he was innocent and Mr. Groseclose did not have a criminal record. (EH Tr. 232). Attorney Brackstone instead called Mr. Groseclose to testify at the mitigation stage and the first evidence he elicited was to have Mr. Grosec-

lose deny the Jury's finding of guilt which, according to Fels, constituted a "slap in the face of the Jury," and was "scarcely calculated to win points for mitigation...." (EH Tr. 232). Attorney William Marett testified that this was counter-productive because, in effect, you are telling the Jury that you do not accept what they have done, and that they have made the wrong decision. (EH Tr. 96). You are starting off on the wrong foot with the Jury. (EH Tr. 95–96). According to Fels, Petitioner Groseclose was prejudiced by the failure of his lawyer to have any comprehensive idea of what that testimony might mean at either phase and why if it were to be called upon it would make sense to call upon it first rather than second. (EH Tr. 253).

19. The next failure that prejudiced Mr. Groseclose was attorney Brackstone's failure to have the court reporter transcribe the closing arguments. This was especially prejudicial since the prosecutor made references in his final argument in the penalty phase about the possibility of parole on a life sentence. (EH Tr. 253–255; EH Tr. 105–106). This was clearly error and later a "member of the Jury asked a question that related directly to it." (EH Tr. 255).

20. There was also a failure of trial counsel with respect to cross-examination of witnesses generally. In addition to the above examples, Mr. Brackstone only cross-examined 17 of the 39 or 40 witnesses called by the state of Tennessee. (EH Tr. 228). Some of these witnesses were important and critical such as the mother of the victim and Mr. Taylor and Mr. Shanks who were invited to participate in the murder. (EH Tr. 228–229). Attorney William Marett also testified that a reasonably effective trial lawyer should interview the family of the victim in connection with both the guilt phase and the sentencing phase. (EH Tr. 93). As to Mr. Mount who was the most critical witness, attorney Brackstone only cross-examined him for eleven pages in what attorney Charles Fels described as "a remarkably limited effort for a critical major witness against your client." (EH Tr. 228). In fact, attorney Charles Fels noted that at one point the District Attorney objected to attorney Brackstone's cross-examination as being "trivial." (EH Tr. 251). Overall, Brackstone's cross-examination during the guilt phase testimony totaled 75 pages of transcript out of 1,600 pages. (EH Tr. 228).

21. Another major failure that prejudiced Mr. Groseclose was attorney Brackstone's failure to develop a theory of defense. As attorney Charles Fels testified, the key to criminal defense is to assess the nature of the evidence, make an independent investigation and decide on the basis of all the facts what the defendant's best position is in terms of either making certain admissions and seeking to mitigate them or deciding to deny them entirely. (EH Tr. 226). He further stated that the reasonable and usually competent attorney will be able to tell you in a sentence or two just what is the theory of the defense. (EH Tr. 226). Attorney Brackstone, when asked at the post-conviction hearing, could only say, "My theory was to do the best I could with what I had." (EH Tr. 226–227). Such a theory, according to Fels, amounts to "an admission of defeat." (EH Tr. 227). At another point, attorney Brackstone says he tried to show that Mr. Groseclose "was not there" but as the Court of Criminal Appeals pointed out, that was an issue that was never in dispute and according to attorney Fels "if anything would seek to advance the interest of the prosecution." (EH Tr. 227).

22. The next major failure by attorney Brackstone that prejudiced Mr. Groseclose concerned the medication administered to Mr. Groseclose. There were numerous areas of prejudice in this matter since such medication could impair the trial attorney's ability to communicate with the client and could have a negative impact on the client's ability to testify. (EH Tr. 224–225). In fact, Mr. Groseclose did testify [at the sentencing phase] and "was apparently under heavy medication at the time" and any professional attorney would want to know what effect that medication had on Mr. Groseclose's appearance, especially as to his credibility in the eyes of the Jury. (EH Tr. 225; EH Tr. 105). According to Marett, a reasonably effective trial lawyer should have investigated what medications his client was taking, especially

"if it is brought to your client, essentially forced him in the sense that the deputy sheriff hands it to him and says, 'Take this.'" (EH Tr. 103).

23. Also testifying about medication given to Petitioner Groseclose in the Shelby County jail was John Bunso, who worked in the County jail in 1977 and 1978. (EH Tr. 368). Mr. Bunso stated that the doctor involved was Dr. Donald Earl who did "a lot of plastic surgery on movie stars" and came up to the jail because "he wanted something to do." (EH Tr. 376). Mr. Bunso spent two pages of testimony (EH Tr. 374–375) saying that he did not know or did not recall what Mr. Groseclose said to anyone about the medication. Mr. Bunso could not remember whether Mr. Groseclose was brought up by himself or with other inmates (EH Tr. 378); could not recall whether the medication was prescribed throughout the whole trial without reviewing records that are "someplace" (EH Tr. 377). But Mr. Bunso did recall that Fernand Brackstone, attorney for Mr. Groseclose, did not interview him. (EH Tr. 378–379). When Mr. Bunso identified the medical records on redirect examination, he then testified on cross-examination that the medical records were very incomplete. For example, the medical records say with respect to the medication to "Recheck Monday" (EH Tr. 383) but there is no entry as to whether Mr. Groseclose was ever rechecked. (EH Tr. 383–384). Then the medical records say that Mr. Groseclose is to be given 400 milligrams of Meprobamate four times a day for four days beginning February 22, 1978. (EH Tr. 385–386). There is no entry on February 26 that the medication stopped because according to Mr. Bunso it "didn't have to say that because he [the doctor] said his statement in there like a prescription. Four days. You stop at the end of four days." (EH Tr. 386–387). But then the medical records have an entry dated March 7, 1978 that says "Reduce Meprobamate." (EH Tr. 387). Mr. Bunso was asked why there is an entry on March 7, 1978 that says "Reduce Meprobamate," if the medicine was only given to Petitioner for four days starting February 22. (EH Tr. 387). Mr. Bunso could not answer the question based on the record. (EH Tr. 387).

24. Further, when the other attorneys put their clients on the stand at the close of the guilt phase to testify that they had decided not to take the witness stand, which was a common procedure at the time, attorney Brackstone instead called Mr. Groseclose to the stand to testify that Mr. Groseclose was the one who had decided to go to trial by pleading not guilty. Only intervention by the trial judge raised the correct question of whether Mr. Groseclose understood that he had a right to testify. (EH Tr. 233–234). Attorney William Marett testified that in a case such as Mr. Groseclose's trial, the trial attorney should be advising the defendant that his only realistic chance is to testify during the guilt phase where the defendant has consistently insisted upon his innocence and testify that the co-defendants are wrong. (EH Tr. 98).

25. The next prejudicial failure by attorney Brackstone, according to Fels, was his waiver of an opening statement at the sentencing phase of trial. A reasonably effective attorney would want to use that opportunity to tell the Jury why they should spare his client's life. (EH Tr. 234). To give or waive such an opportunity was "a remarkable decision." (EH Tr. 234). Then in closing, attorney Brackstone argued for only nine minutes.

26. In conclusion on this issue of attorney Brackstone's incompetence prejudicing the outcome of the trial, attorney Charles Fels was asked "Would this list, a catalog of sins and omissions and commissions that you have described, deficiencies in Mr. Brackstone's performance that you have given your opinion to, would it have reasonably resulted in prejudice to the defendant in Mr. Groseclose's position in this trial?" Mr. Fels replied, "whenever you have a lawyer who simply does not believe in the defense case and becomes, in effect, an ally of the prosecution, it is inherently prejudicial." (EH Tr. 234–235). In his opinion, attorney Brackstone abandoned his client in this case and denied him "effective assistance of counsel in the most fundamental sense." (EH Tr. 235). There was no vigorous advocacy of the defendant's cause at this criminal trial and there

was a failure to mount a zealous case. (EH Tr. 257). For example, there was no investigation or consideration by attorney Brackstone of the example of a defense given by attorney Fels that trial counsel could have used a defense of blaming co-defendants Rickman and Britt who for reasons known only to them had decided to implicate Mr. Groseclose into the murder conspiracy by fabricating his involvement. (EH Tr. 248; EH Tr. 100, 190). Attorney Brackstone was asked about this specifically at the post-conviction hearing and testified that attacking the story of Rickman and Britt was not part of his theory of defense. (PC Tr. 376–377; EH Tr. 256–257).

27. Petitioner Groseclose called expert witness William J. Marett, Jr. Mr. Marett is an attorney licensed to practice in Tennessee who does trial practice of which about fifty percent is criminal defense. He has tried criminal cases in Memphis, has assisted in several post-conviction proceedings in Memphis, has attended CLE criminal law seminars in Memphis sponsored by the Memphis-Shelby County Public Defender and Federal Public Defender office of the Western District of Tennessee as well as those sponsored by the Tennessee Bar Association and the Tennessee Association of Criminal Defense Lawyers. He is a member of the Criminal Justice Panel for the United States District Court for the Middle District of Tennessee and was a contributor to "Tools for the Ultimate Trial", a death penalty manual published the Tennessee Association of Criminal Defense Lawyers. (EH Tr. 76–78). Attorney Marett has read the entire Groseclose record and transcript and prior to 1985 Mr. Marett practiced law with Mr. Groseclose's present attorney and prior to 1985 Mr. Mar-

ett from time to time assisted in the representation of Mr. Groseclose in state court post-conviction proceedings. (EH Tr. 79–80)[3]

28. Attorney William Marett testified that attorney Brackstone failed to perform at the level of skill and competence required of Tennessee attorneys and that attorney Brackstone failed to conduct proper investigation, failed to keep his client advised, failed to involve his client in the preparation of a defense, and was "clearly ineffective and incompetent to represent Mr. Groseclose." (EH Tr. 82–83).

29. According to attorney William Marett, it is the obligation of the defense attorney to investigate all of the facts surrounding the bringing of the charge and to determine if there are witnesses to be called. (EH Tr. 83). It is also essential that the defense attorney find out as much as he can about the defendant himself. (EH Tr. 83). In a death penalty case the investigation must be much more extensive because, according to Marett, "you are presenting the entire life of who the defendant is, his experiences, to the Jury." (EH Tr. 84).

30. Attorney William Marett noted that there were several publications in existence at the time of the Groseclose trial that specifically outlined these investigative obligations in a criminal case. (EH Tr. 84). Further, the Tennessee death penalty statute was a new law so there was considerable discussion in the professional literature about an attorney's obligations in such a case. (EH Tr. 85).

31. Attorney William Marett testified that the defense attorney cannot make a determination as to whether or not his client

---

3. Opposing counsel objected to Mr. Marett's testimony on the grounds that he cannot act as both counsel and witness. First, Mr. Marett is not now nor has he ever been counsel of record in this case of *Groseclose v. Bell*, Case No. 3:89–0662. Mr. Marett testified in fact that he has had no connection with Mr. Groseclose or his case in the last ten years and that his prior representation of Mr. Groseclose would not affect his opinions. (EH Tr. 80). Second, in the alternative the rules of the Tennessee Supreme Court that govern professional responsibility of attorneys in Tennessee (Rule 8) provides in EC 5–10 that "Where the question arises, doubt

should be resolved in favor of the lawyer testifying and against becoming or continuing as an advocate." Third, *Whalley Dev. Corp. v. First Citizens Bancshares, Inc.*, 834 S.W.2d 328 (Tenn. Ct.App.1992), holds that the Code of Professional Responsibility does not absolutely prohibit a lawyer from testifying at trial when he is also counsel of record and notes that the matter is within the discretion of the trial judge. The court in *Whalley Dev. Corp.* also confirmed again that any doubts about such an issue should be resolved in favor of the lawyer testifying. The Court accepted the testimony of Mr. Marett as admissible.

can testify or should testify until he or she has investigated the client's background. (EH Tr. 85).

32. Attorney William Marett testified that in defense of any criminal case, investigation must be wide-ranging; not only must the defense lawyer investigate to determine whether there are witnesses to provide factual information about the whereabouts of the defendant during the crime with which he is charged, but that in all criminal cases the eventuality of a conviction and a sentencing hearing must be prepared for and anticipated and this "clearly requires" the defense attorney to investigate the defendant's background to determine if there are family members, friends, employers, educators who can testify as to what is an appropriate sentence for the defendant and to present a case for mercy to the sentencing authority. (EH Tr. 86; EH Tr. 109–110).

33. Attorney Marett testified that attorney Brackstone did not ask for an on the record hearing about the medication (EH Tr. 111); did not file the kind of pre-trial motions that a reasonably effective attorney would (EH TR. 111–112); failed to order the entire trial transcript (EH Tr. 112); failed to present any proof of Mr. Groseclose's conduct in the jail awaiting trial (EH Tr. 112); failed to interview the crime incident witnesses such as Aline Davis, Pam Baker, Sgt. Childers, and others (EH Tr. 186); failed to interview or call other family members to testify (EH Tr. 112); failed to introduce Mr. Groseclose's military records (EH Tr. 112); failed to call expert witnesses to testify (EH Tr. 112); failed to call witnesses concerning Mr. Groseclose's religious activities and church attendance (EH Tr. 112–113); failed to put on proof about Mr. Groseclose's volunteer activities in the community (EH Tr. 113) and generally just followed in the footsteps of and did whatever attorney Livingston did. (EH Tr. 113). Attorney Marett testified that Mr. Groseclose's trial was prejudiced because of these failures and because of attorney Brackstone having no theory of the case as to a defense. (EH Tr. 114). Attorney Brackstone did not call a single witness or put on any proof during the guilt phase and waived his closing argument. (EH Tr. 188). At the post-conviction hearing, however, attorney Brackstone inaccurately claimed that he did put on proof during the guilt phase. (EH Tr. 188–189).

34. Marett stated that for every witness defense counsel must determine the strengths and weaknesses of that particular witness through investigation. (EH Tr. 87–88). In a case where the defendant had an honorable discharge and service with commendation medals in Vietnam, defense counsel would want to present witnesses and evidence about it. (EH Tr. 89). Marett testified that the best thing about military record evidence is that you can present it as an official government document that speaks for itself. (EH Tr. 89).

35. Testimony that was effective for co-defendant Britt in winning life imprisonment over the death penalty was evidence of his relatively youthful age, his lack of a criminal record, and expert witnesses on sociological or religious matters relating to Mr. Britt. (EH Tr. 312).

36. Mr. Groseclose specifically suggested to attorney Brackstone that a minister should be called to testify, but attorney Brackstone did not do so. (PC Tr. 203–204). Attorney William Marett testified that evidence about the defendant's church involvement, religious activity, or church attendance would be an absolutely relevant matter to investigate and present in a death penalty case. (EH Tr. 94–95, 108). Gladys Adams is the General Overseer of the Church of God in Memphis and acts today as the chief religious and administrative officer of that church. (EH Tr. 16). Reverend Adams testified that in 1977 and in 1978 she knew Mr. Groseclose because he was a neighbor of her son and her daughter-in-law babysat his children. (EH Tr. 17). She would see Mr. Groseclose about once every week or two weeks at her son's house. (EH Tr. 26). Also, Mr. Groseclose visited her house, worked on her car, and was well-known/well-liked in the neighborhood. (EH Tr. 17). At that time Mr. Groseclose did not attend her church but attended a Methodist church. (EH Tr. 17). From July 1977 until trial in February 1978, while Mr. Groseclose was incarcerated in the Shelby County Jail, Re-

verend Adams ministered to him weekly in the jail. (EH Tr. 17). Reverend Adams believes that Mr. Groseclose was sincere in his professing his Christian faith to her on many occasions. (EH Tr. 18). As Reverend Adams said, "... I have been in church work all of my life and I am now 72 and you finally reach an ability—not every time—but most of the time of evaluating whether a person is sincere. And I also rely on the Holy Spirit to confirm to me whether a person is sincere." Not only did Reverend Adams believe Mr. Groseclose was sincere, her church subsequently ordained or licensed Mr. Groseclose as an ordained minister. (EH Tr. 18–19).

37. Reverend Adams was present in Memphis when Mr. Groseclose's criminal trial took place. (EH Tr. 19). She would have been available to testify on his behalf on request by attorney Brackstone. (EH Tr. 19–20). Attorney Brackstone never talked to her about the possibility of being a witness and never talked to her son (Mr. Groseclose's neighbor) about the possibility of being a witness. (EH Tr. 20). Reverend Adams personally attended the trial (EH Tr. 20) and introduced herself to attorney Brackstone as the minister who had ministered to Mr. Groseclose in jail. (EH Tr. 22). Attorney Brackstone still did not issue a subpoena for her and did not ask her to testify. (EH Tr.22).

38. Attorney Brackstone could also have called other ministers and religious authorities. Bishop Kenneth L. Carder is the Bishop of the Methodist Church for the Tennessee and Memphis Conferences comprised of about 1,100 churches in Tennessee and Kentucky. (EH Tr. 31). Bishop Carder is a magna cum laude graduate of East Tennessee State University who received his Master of Divinity from Wesley Theological Seminary and his Doctor of Ministry from Vanderbilt. He has served pastoral appointments in Johnson City, Tennessee, Bluff City, Tennessee, Knoxville, Tennessee and Oak Ridge, Tennessee. He has been active in civic and community involvement throughout Tennessee including service on a statewide criminal justice panel appointed by the Governor in 1977. Bishop Carder has orga-

nized volunteer chaplaincy programs in county jails since the late 1960s and has lectured and led workshops on criminal justice issues for at least 25 years. (EH Tr. 31–35).

39. Bishop Carder has chaired task forces in Tennessee on criminal justice and in 1977 received considerable media publicity in both newspapers and television for his work on the statewide criminal justice panel. Bishop Carder would have been available to testify at the penalty phase of the trial if asked to do so in Mr. Groseclose's case in 1978 in Memphis. (EH Tr. 37–38). Bishop Carder would have testified "that in a whole body of Christian literature and ethical position, that the death penalty is contrary to our Christian understanding of life and the criminal justice system; that it violates the very teachings, spirit and example of Jesus. It is also contrary to our United Methodist official position as approved by the General Conference, which is the legislative body of our church." (EH Tr. 38–39). Bishop Carder would also have testified at Mr. Groseclose's trial that the death penalty should not be imposed because it removes the possibility of redemption and "puts in the hands of human beings that which belongs to God...." and "counters our understanding that retribution is not a valid aspect of the criminal justice system." (EH Tr. 39).

40. Bishop Carder was asked hypothetically that if Mr. Groseclose had a long childhood of troubles ranging from absent parents to an invalid mother and Mr. Groseclose had no prior criminal record and exhibited willingness and ability to perform volunteer work in the community and had an exemplary record in the county jail awaiting trial, whether that would affect his opinion that he would have given the Jury as to the possibility of redemption for such a defendant. Bishop Carder, in response to this hypothetical question, testified that a person who would have demonstrated those qualities would be a candidate for rehabilitation, redemption, and restitution. (EH Tr. 40–41).

41. Another minister who could have testified in the Groseclose trial if asked is the Reverend Joseph Ingle. Reverend Ingle has been very active in organizing groups opposed to the death penalty in Tennessee and

throughout the south, primarily the Southern Prison Ministry and the Southern Coalition on Jails and Prisons. (EH Tr. 51). Reverend Ingle organized in churches and with other ministers to counsel or minister to prisoners (EH Tr. 52) and edited and published a newsletter about the work against the death penalty and for criminal justice reform in Tennessee. (EH Tr. 53).

42. That newsletter was routinely sent to defense attorneys. (EH Tr. 53). Reverend Ingle lobbied in the Tennessee legislature, worked with groups in Memphis, worked with the American Bar Association, the Tennessee Bar Association, and the Tennessee Association of Criminal Defense lawyers in the 1970s. (EH Tr. 53, 57). He specifically tracked death penalty cases and had a clipping service to keep up with death penalty indictments where he and his organization could then "initiate correspondence to the lawyers ... trying to help." (EH Tr. 54). Reverend Ingle would have routinely done that with respect to the 1977 indictment against Mr. Groseclose. (EH Tr. 54, 58–59, 64). Among other material that Reverend Ingle and his organizations would have routinely provided to defense attorneys in the 1970s would have been "booklets that were available for trial lawyers, how to do a death penalty trial, focus on the sentencing phase, focus on the entire trial breakdown, voir dire, the whole nine yards, everything that takes place in a death penalty trial." (EH Tr. 55). They would have put the defense lawyer in touch with other resources such as large firms and law professors such as Anthony Amsterdam who were willing to volunteer their services or advice. (EH Tr. 55).

43. In addition, they provided and made available a standard package of pre-trial motions for defense attorneys in 1977 and 1978. (EH Tr. 55–56). These motions concerning a death penalty trial were prepared by the Southern Poverty Law Center and included about 150 different pre-trial motions on death penalty cases with supporting briefs and memoranda of law. (EH Tr. 56). They also offered expert witnesses testimony to defense lawyers to testify at the sentencing phase of death penalty trials. (EH Tr. 59). There were other organizations that were active in death penalty litigation who would have made resources available to assist in this case. (EH Tr. 102). Reverend Ingle would have been willing to testify in March 1978 at the penalty phase of the Groseclose death penalty trial as he had done in other cases. (EH Tr. 61). Reverend Ingle, however, was never contacted by attorney Brackstone with respect to these resources or help. (EH Tr. 56, 59).

44. The empirical record in the trial court manuscript makes it clear that expert testimony on mitigating factors (such as the testimony of Reverend Ingle and Bishop Carder offered in this case) would have been admitted by the trial judge Leonard T. Lafferty at Petitioner's trial in March 1978 by the Shelby County Criminal Court since said judge had to rule on the same issue when such testimony was offered in favor of and on behalf of the co-defendant Phillip Michael Britt. Trial attorneys for co-defendant Britt at the sentencing phase called Dr. Harry E. Moore, Jr. who was the state director or the National Conference of Christians and Jews and who had been a church minister for about 20 years. (St.Ct.Tr.1919–1920). Dr. Moore was offered as an expert in the field of religion (St.Ct.Tr.1921) and there was a hearing regarding the admissibility of his testimony. (St.Ct.Tr.1923). The District Attorney Hugh Stanton objected to the testimony based on relevancy, materiality, and not being pertinent to mitigation. (St.Ct.Tr.1925). The ruling by the court was to admit such testimony:

> [The court]: I shall go ahead and permit Doctor Moore to testify and the jury may accept it, they may reject it, based upon my—And you may cross-examine and you may have a learned minister of theology come in here, General, and you've got an opportunity to rebut. So I'll let him testify. (St.Ct.Tr.1928).

The same ruling was made with respect to other experts such as Dr. Kirk R. Williams:

> [The court]: Now, I'm going to let him testify as an expert in this area, which means he's subject to cross-examination, which means the State can rebut it under the statute, if they've got an expert witness on criminology or these social deviate be-

haviors.... So, I'm going to deny the State's motion to exclude his testimony. (St.Ct.Tr.1894).

45. Again, Petitioner would note for the Court that these are the witnesses who testified in mitigation for co-defendant Britt. When Britt's attorney, Thomas Paul Pera, testified on April 11, 1995 in this case he was asked if Mr. Brackstone, attorney for Groseclose, could have done the same things for his client as Mr. Pera did in investigating and preparing for the mitigation stage and Mr. Pera agreed that Mr. Brackstone could have. (EH Tr. 290). Mr. Pera was specifically asked on cross-examination if he had contacted Dr. Kirk Williams. (EH Tr. 290). Then the following exchange took place:

Q. ... You or one of your lawyer colleagues contacted Dr. Kirk Williams at the then-named Memphis State University, solicited his assistance and preparation to both go and meet with his client numerous times and then to testify at the mitigation hearing about the deviant criminal behavior and generalized mitigating factors, correct?.

A. That is correct.

Q. And you asked Dr. Williams to focus and concentrate on including your client, Mr. Britt, in the descriptions that he gave to the Jury, didn't you?

A. That is correct.

Q. You were doing a very effective job in mitigation of that, weren't you?

A. We would like to think so.

Q. Any lawyer could have gone to Memphis State University or any of the other colleges in the area or in the state and found similar type witnesses, couldn't they?

A. Yes, they could have gone and talked to a criminologist and had them interview the client and see if they could have come up with something.

Q. And no such witnesses appeared in mitigation of behalf of Mr. Groseclose, did they?

A. I don't recall one....

(EH Tr. 290–291).

46. Accordingly, there can be no question based upon this empirical record that since similar testimony concentrating on the co-defendant Britt was admitted, that the same kind of evidence could have been admitted on behalf of Petitioner Groseclose.

47. Further, attorney Brackstone failed to investigate or call family members as witnesses. Doris Frazier, who is Mr. Groseclose's first cousin, testified that she has lived in Woodbury, Tennessee continuously since before the Groseclose criminal trial. (EH Tr. 67–68). Ms. Frazier, who was a junior in high school when Mr. Groseclose was born, lived in the same home together with Mr. Groseclose until he was about six years old and she stated that Mr. Groseclose was her baby in a round-about way. (EH Tr. 68). Ms. Frazier testified that Mr. Groseclose's mother was often absent from the home because she worked part time in Maryland, hundreds of miles away. (EH Tr. 68–69). Ms. Frazier testified that Mr. Groseclose's grandmother acted as a surrogate parent along with Ms. Frazier. The grandmother died when Mr. Groseclose was in high school and Ms. Frazier moved out to get married when Mr. Groseclose was still a child. (EH Tr. 69–70). Ms. Frazier testified that Mr. Groseclose's mother and father were divorced and Mrs. Groseclose later married a man named Taylor. (EH Tr. 70). Ms. Frazier testified that when Mr. Groseclose was in high school his mother became an invalid as the result of an accident and had to be cared for in her home. (EH Tr. 70). Ms. Frazier maintained her contact with Mr. Groseclose, visiting "quite often," after she moved away from their home. (EH Tr. 70, 72). Ms. Frazier was never contacted by attorney Fernand Brackstone for information or to be asked to testify at trial. (EH Tr. 71). If attorney Brackstone had asked her to come to Memphis and testify in February or March 1978, she "absolutely" would have done so. (EH Tr. 71). To her knowledge, attorney Brackstone did not contact any of Mr. Groseclose's family members. (EH Tr. 71).

48. Another witness who could have testified at trial in 1978 but was not interviewed and was not called was Samuel J. Spille. Mr. Spille was a Memphis resident who served in the Navy over 30 years and retired in 1971

and worked for the Assessor's office and City Treasurer's office until 1992 and is now fully retired. (EH Tr. 202–203). Mr. Spille has been active in volunteer work in the Memphis community primarily in the Shelby County Auxiliary Probation Service since 1971 through the present. These auxiliary volunteers supervise juvenile court probationers, make monthly reports on them, keep the court informed of their progress, and report to the court. (EH Tr. 203–204). In 1977 and 1978 Mr. Spille was a Division Chief of this auxiliary volunteer service and one of the volunteers working under him from 1973 through the time of his arrest was Petitioner Groseclose. (EH Tr. 204). Mr. Spille testified that Petitioner Groseclose was assigned probationers and carried out the duties described above and did an average job in these volunteer services. (EH Tr. 205). Mr. Spille was never interviewed or contacted by attorney Brackstone. (EH Tr. 205).

49. Another family member who could have testified is Karen Naylor, Mr. Groseclose's cousin, who testified that Mr. Groseclose was like a big brother to her. (EH Tr. 195–196). She would have been available to testify in February or March 1978 but was never contacted and never interviewed by attorney Brackstone. (EH Tr. 196).

50. Ms. Naylor testified that she came to Memphis in 1978 for the motion for new trial hearing in Mr. Groseclose's case and spoke to Mr. Groseclose at the jail, who complained at the time about attorney Brackstone's representation and complained that he was under the influence of some kind of drug, saying, "Karen, I think I might have laughed through it. I don't even know what happened." (EH Tr. 197). Ms. Naylor then confronted attorney Brackstone and asked why the family had not been contacted (EH Tr. 197) and asked if it was true that Mr. Groseclose had been drugged at trial and attorney Brackstone said, "Yes, ma'am. We have to keep them under control somehow and that is normal procedure." (EH Tr. 197–198).

51. As Petitioner William Groseclose testified in his deposition on February 9, 1995, he was stopped by the county medical personnel on his way to court and first adminis-

tered Dalmane and Meprobamate. (Groseclose Dep. at 4–5). Mr. Groseclose did not request the medication (Groseclose Dep. at 5) and cannot remember how many times a day it was given because he was really "foggy" during that time. (Groseclose Dep. at 6). There was no appointment requested by Mr. Groseclose and Mr. Groseclose never asked for or indicated that he was having any trouble sleeping. (Groseclose Dep. at 62; PC Tr. 233). The Shelby County jail had "set up an appointment for us" to see the physician or physician assistant and that person said he was giving the pills to help with a sleeping problem. (PC Tr. 223).

52. The other primary effect of this medication was to make it so that Mr. Groseclose "wasn't too able to notice anything." (Groseclose Dep. at 8). With respect to the medication, Reverend Adams, who attended the trial and had observed Mr. Groseclose closely during her weekly ministering to him in jail, testified that at trial Mr. Groseclose did not act very alert or normal, unlike his usual highly intelligent, vibrant self. (EH Tr. 24). Attorney Brackstone admitted in 1982 that at one point during the trial he had to tell Mr. Groseclose to stop giggling because the Jury does not like to see things like that. (PC Tr. 383). When asked how the medication affected him, Mr. Groseclose replied that he was sleepy and drowsy all the time. He indicated that if he got still or quiet for any length of time at all he would start nodding and go to sleep. He recalled that he had no appetite at all but stayed cotton mouthed or thirsty all the time. He further stated, "I really don't remember too much how I was because I just didn't feel anything. I just wanted to sleep all the time." (Groseclose Dep. at 62–63). The medication made it very difficult to wake up and made it so that he did not have any energy. (PC Tr. 234). This medication was administered seven days a week and made it so that Mr. Groseclose had to fight to stay awake. (PC tr. 235). A couple of times during the trial he went to sleep and on several occasions he would nod over on Mr. Rickman's shoulder and be pushed awake. (PC Tr. 235–236). As a result, Mr. Groseclose was not able to take in everything that happened in the courtroom.

(PC Tr. 236). The drugs affected his memory and affected his ability to be clear-headed and hold a train of thought. (PC Tr. 239–240). Mr. Groseclose had never been prescribed either of these two drugs before. (PC Tr. 238). One of the other effects was that Mr. Groseclose was very "hazy" about being on the witness stand during the sentencing phase of his trial. (Groseclose Dep. at 61–62, 66). Trial attorney Brackstone never requested the court to cease medicating Mr. Groseclose unlike the actions taken by attorney Pera, co-counsel for defendant Britt. (EH Tr. at 298–301). Attorney Brackstone's primary inquiry about the medication was to ask one of the court officers if the drugs or medication would affect Mr. Groseclose. (PC Tr. 384). Attorney Brackstone admitted that he never checked any *Physician's Desk Reference* or medical publication as to the effect of the drugs (PC Tr. 385) and admitted that he did not make any other inquiry as to the effect. (PC Tr. 385). Attorney Brackstone then changed his testimony to say that he talked to medical doctors who were not connected with the case who assured him the drugs were not exactly tranquilizers, but they were something to keep them quieter. (PC Tr. 385).

53. Mr. Groseclose was in no position to object to the medication. As he testified: "You just didn't question them [in connection with medication]. You would get your head thumped down there if you asked too many questions. If they called you to sick bay and told you they were going to give you a chest X-ray, you took it. If they called you in there and said they were going to give you a pill, you took it." (Groseclose Dep. at 21). Mr. Groseclose never requested the medication. (Groseclose Dep. at 5). Mr. Groseclose told attorney Brackstone that he was on medication during the trial and Brackstone asked if they prescribed it for him. When Mr. Groseclose answered in the affirmative, Brackstone said, "then take it." (Groseclose Dep. 40).

54. Mr. Groseclose raised this medication issue with his trial attorney. (Groseclose Dep. 63). The state did not stop giving the medication to Mr. Groseclose until about three days before he was transported to the state prison in Nashville. (Groseclose Dep. at 63).

55. Mr. Groseclose was handcuffed in front of the Jury for "a pretty good while" and handcuffed as they were brought in and then the Jury came in. (Groseclose Dep. at 11–12). Trial attorney Brackstone made no objection.

56. A grenade detonator was introduced in front of the Jury by the prosecution. The detonator had been found at co-defendant Rickman's residence and as Mr. Groseclose testified, it was used to demonstrate a violent nature and "I was sitting right next to him and they were looking at him and me together, you know." (Groseclose Dep. at 13–14). Again, Brackstone made no objection.

57. Petitioner Groseclose testified that in many different areas his trial attorney Brackstone deferred to the co-defendant's attorney Robert Livingston. (Groseclose Dep. at 29–30). Attorney Brackstone "more or less turned everything over to Livingston ... Livingston did not proceed the way I thought my case should proceed." (Groseclose Dep. at 37). Petitioner Groseclose testified that attorney Brackstone "said that Mr. Livingston was the lead counsel for the defense and that he was just going to follow him." And "that's exactly what he did." (PC Tr. 214). Petitioner Groseclose never agreed to this arrangement. ("I didn't hire Mr. Livingston; I hired Mr. Brackstone.") (PC Tr. 214). Attorney Brackstone admitted that he worked as a team with Livingston and decided Livingston would be lead counsel. (PC Tr. 379). Attorney Brackstone relied upon attorney Livingston to ask about evidence for mitigation. (PC Tr. 388). In fact, as to the four witnesses attorney Brackstone did call in mitigation, he seemed surprised by the testimony or answers that they gave. (PC Tr. 391–392). Petitioner Groseclose pointed out that his defense was different from that of the co-defendants and therefore Livingston could not present a unified defense. (Groseclose Dep. at 39). Attorney Pera who represented co-defendant Britt confirmed this by testifying that "Mr. Britt and Mr. Groseclose definitely had different roles in the perpetration of this crime." (EH Tr. 303). The performance of attorney Liv-

ingston in this same 1978 trial has already been ruled by this United States District Court as failing to comply with constitutional requirements. *Ronald Eugene Rickman v. Michael Dutton, Warden,* 854 F.Supp. 1305 (M.D.Tenn.1994).

58. Petitioner Groseclose testified that he provided his trial lawyer Brackstone with the identity of witnesses to investigate and interview and was asked by opposing counsel what they would have provided and answered, "Character witnesses, I suppose. They—and some testimony during the trial, people said some things, you know, that were out and out lie." Petitioner Groseclose then gave specific examples including testimony given by a prosecution witness about his wife's rings. (Groseclose Dep. 31–34, 57–61). By character witnesses Mr. Groseclose meant that they could have testified about his life, how he had lived it, and the type of person he was. (Groseclose Dep. at 22). Petitioner Groseclose also wanted another witness cross-examined and two other witnesses put on the stand to rebut false testimony, but attorney Brackstone "refused to do so." (PC Tr. 214). Petitioner Groseclose identified these witnesses for attorney Brackstone, but attorney Brackstone "flat refused" because he said "we's put on our proof in the second phase...." (PC Tr. 216). Further, attorney Brackstone claimed to have investigated this case by going to the Krystal on Union Street in Memphis to check on the alleged Rickman/Groseclose meeting (EH Tr. 143) when in fact the District Attorney's office had told Brackstone that the meeting was at the Shoney's on Union Street. (EH Tr. 319).

59. Petitioner Groseclose also pointed out that attorney Brackstone should have used experts on the death penalty to testify at the sentencing phase (Groseclose Dep. at 40) such as experts who could have testified about his sociological conditions and religious matters as well as a competent psychological evaluation. (Groseclose Dep. 41).

60. Trial attorney Brackstone also failed to investigate the state's witnesses. For example, he never interviewed the family of the victim. Ms. Aline Davis Watts is the mother of the victim, who lived in Memphis and was also present at the criminal trial. (EH Tr. 349–351). Ms. Watts testified that attorney Brackstone never interviewed her about her trial testimony, never interviewed her about any of the information to which she testified, and that her only conversation with attorney Brackstone was when attorney Brackstone requested that she return a Bible to Mr. Groseclose. (EH Tr. 351). Doris Porch, the aunt of the victim, was present at the trial and admitted at the evidentiary hearing that attorney Brackstone never interviewed her about any of the criminal charges. (EH Tr. 358). Ms. Porch further admitted that she has written a book about the case and in a letter referring to the book she stated, "There are people walking free who never served a day in any jail who knew before her death that she [the victim] was going to die and knew with certainty that she had died the very day the act was carried out." (EH Tr. 359, 360). Ms. Porch further is of the opinion that Petitioner Groseclose and his co-defendant Rickman are not the only persons who should be on death row with respect to her niece. (EH Tr. 361). Attorney Brackstone never interviewed Ms. Porch about any of this. (EH Tr. 361).

61. District Attorney General Hugh W. Stanton, Jr. who prosecuted this case in 1978 testified at the evidentiary hearing and admitted that he could have called the mother, Aline Watts, [and other family witnesses like her] as a witness during the penalty phase at the original trial. (EH Tr. 325). Former District Attorney General Stanton testified that attorney Brackstone knew early on that this was a case that would have to be tried and would not be settled or plea bargained. (EH Tr. 334). Former District Attorney Stanton knew nothing about any evidence or exhibits at the criminal trial involving "a box of baby toys or a refrigerator." (EH Tr. 334–335). Petitioner Groseclose testified that attorney Brackstone claimed that the evidence the State was going to present constituted a "box of baby's toys and a refrigerator" and things that had absolutely nothing to do with the case whatsoever and that that was all they had. (PC Tr. 212). Former District Attorney Stanton offered opinions on direct as to mitigation and prejudice and on

cross-examination stated that he did not know whether mitigation evidence that could have been presented would have impressed a member of the Jury or not. (EH Tr. 336–337). Former District Attorney Stanton only tried three criminal cases since 1974 including this case. (EH Tr. 337). When asked to compare the Jury's leniency for co-defendant Britt [who actually raped the victim and put her in the truck of a car, but received life imprisonment rather than death], District Attorney Stanton agreed that co-defendant Britt was successful because of the testimony of his family members which "was a big factor in the Jury not giving Britt the death penalty" (EH Tr. 339) and testimony about his youth, his minor criminal record, and expert testimony on religion and on deviant behavior. (EH Tr. 339). Again, attorney Brackstone did not present those kind of experts or family witnesses although the former District Attorney concluded after questioning that he believed family life to be very important with regard to the Jury on sentencing. (EH Tr. 339).

62. Trial attorney Brackstone advised Mr. Groseclose that there were two phases to a death penalty trial and that the first phase of the trial is for the Attorney General's office to put on their proof and that the second phase was for the defense to put on its proof. (Groseclose Dep. at 53; PC Tr. 207–208). When Petitioner Groseclose would object or raise questions to attorney Brackstone during the trial, Mr. Brackstone indicated that it would be taken care of in the second phase. (PC Tr. 208). Trial attorney Brackstone then advised as to strategy at each phase that "there is nothing we can do in the first phase except take notes." Groseclose stated to Brackstone that he was of the impression that you have got two opposing sides and one says something and you cross-examine them. However, Brackstone reiterated that it was a bifurcated trial and the Attorney General puts on their case and the second phase is where the defense puts on their case. To his chagrin, Petitioner testified, "I found out later that's not true." (Groseclose Dep. at 53).

63. Petitioner Groseclose, in addition to requesting of attorney Brackstone that members of his family testify, also suggested other witnesses who were not contacted or called. (EH Tr. 203–204). Attorney Brackstone admitted to Petitioner Groseclose that he never talked to these suggested witnesses. (EH Tr. 204). This is confirmed by the testimony of Thomas Pera, the co-defendant's attorney, who testified that of the "numerous witnesses" that his office interviewed in connection with the Groseclose case that he cannot recall a single witness or any witness who said that he or she had been interviewed by attorney Brackstone. (EH Tr. 297). Attorney Pera testified that attorney Brackstone was not involved in any of his investigation and preparation with these numerous witnesses. (EH Tr. 294).

64. Attorney Brackstone suggested that Groseclose sell his house to raise money to pay a private investigator. (PC Tr. 206). Attorney Brackstone claimed that he was going to take the money from the sale of Mr. Groseclose's house to hire an investigator. (PC Tr. 205). Although the house was sold, there does not appear to have been any investigator and attorney Brackstone said he did not find out anything. (PC Tr. 205). When Petitioner Groseclose asked for a copy of the investigator's report, attorney Brackstone said that he had misplaced it, he did not have it any longer. (PC Tr. 205).

65. Attorney Brackstone lost, mislaid, destroyed or otherwise did not have his trial notes and file concerning Groseclose. These notes and files were requested by Petitioner Groseclose and his family within a few days after the trial (PC Tr. 229) and attorney Brackstone told them then that he had lost or misplaced them. (PC Tr. 230). Mr. Groseclose's family volunteered to stay at attorney Brackstone's office and help him find the notes and file but Brackstone said he had an appointment and did not have time to look for them then. (PC Tr. 231). Later attorney Brackstone told Mr. Groseclose he had thrown the notes away, that they were not important, that everything would be in the transcript. (PC Tr. 231). In fact, the notes were vitally important because Brackstone had three yellow pads full of notes that he'd written down of things Groseclose objected to and had asked him about. (PC Tr. 228).

66. Attorney Brackstone made the same claims respecting his trial notes and his file about his representation of Mr. Groseclose as he did about the private investigator. Attorney Brackstone admitted he did not provide his file or notes to Mr. Groseclose or his new lawyer. First he said he did not provide them because no one could have read or understood them. (PC Tr. 403). Next attorney Brackstone said that he had moved and Mr. Groseclose's file had been "misplaced or destroyed." (PC Tr. 404). Next he said that he had "lost part of it." (PC Tr. 404). Next he said, "No, it hadn't been destroyed, to my knowledge. It might have been destroyed, but I didn't destroy it." (PC Tr. 404). Then he said that the file had been "lost or inadvertently misplaced" as he stated in a letter dated June 6, 1979. (PC Tr. 405). When asked when he lost Mr. Groseclose's file, attorney Brackstone said, "I don't know the exact time. The filing cabinet drawers fell out and papers went everywhere, and going through them trying to get them back in order, well, I couldn't find anything with that case on it...." (PC Tr. 406). Attorney Brackstone also failed to obtain a complete transcript of the criminal proceedings because he made an affirmative decision not to ask for a transcription of the closing arguments of the prosecutor and defense lawyer. (PC Tr. 397–398). Attorney Brackstone also waived various arguments that he had a right to make to the Jury. (PC Tr. 392–393).

### (2) Selection of Jury Foreman

67. In Petitioner Groseclose's petition for habeas corpus relief, he specifically raised the issue of the Shelby County grand jury being selected and composed in violation of the federal Constitution under the Fifth, Sixth, and Fourteenth Amendments in that black and female grand jurors and grand jury forepersons had been systematically excluded resulting in substantial under representation. (Petition for Writ of Habeas Corpus, ¶¶ 30, 32, 33).

## II. CONCLUSIONS OF LAW

A. *Claim 1: Ineffective Assistance of Counsel*

██ A criminal defendant has a Sixth Amendment right to receive effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 685–86, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). The standard for establishing "cause" as a result of ineffective assistance of counsel is two-pronged: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687, 104 S.Ct. at 2064. To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. Mere attorney ignorance or inadvertence will not constitute "cause" unless the error rises to the level of a constitutional violation. *See Coleman v. Thompson,* 501 U.S. 722, 752–55, 111 S.Ct. 2546, 2566–67, 115 L.Ed.2d 640 (1991). The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell,* 506 U.S. ——, ——, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993).

██ In assessing counsel's performance, a reviewing court must be highly deferential. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. The court must determine whether under the circumstances counsel's allegedly unreasonable acts or omissions "were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066. While strategic choices made after thorough investigation are generally considered within the range of competent assistance, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. at 2066. *See also Martin v. Rose,* 717 F.2d 295 (6th Cir.1983) (counsel ineffective where failed to interview alibi witnesses and unaware of investigative file prepared by public defender); *United States v. Goodwin,* 531 F.2d 347 (6th Cir.1976) (counsel ineffective where misunderstood elements of offense and examined client at preliminary hearing in such a manner that client inadvertently confessed).

■ The Sixth Amendment and Fourteenth Amendment requirements of effective assistance of counsel also apply to the penalty phase of trial. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Courts are particularly cautious in preserving a defendant's right to effective assistance of counsel at a capital sentencing hearing. *See, e.g., Kubat v. Thieret,* 867 F.2d 351, 367 (7th Cir.), *cert. denied* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989); *Deutscher v. Whitley,* 884 F.2d 1152, 1160–61 (9th Cir.1989); and *Harris v. Dugger,* 874 F.2d 756, 763 (11th Cir.) *cert. denied* 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989).

Groseclose asserts that he was denied the effective assistance of counsel at the guilt phase of trial because his attorney failed to investigate, prepare, or present a defense to the charges against him, and at the penalty phase of trial because his attorney failed to investigate mitigating factors, prepare, and call family and expert witnesses to testify. Although State court factual findings are entitled to a presumption of correctness under 28 U.S.C. § 2254(d), the Court recognizes that the question of effectiveness of counsel raised in the instant claim is a mixed question of law and fact which is subject to a *de novo* review by this Court. *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070.

### 1. *Deficient representation*

■ The standard for measuring attorney performance is "reasonableness under prevailing professional norms." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065. Trial counsel was thus bound by a standard of care applicable when this case was tried in 1978 in Shelby County, Tennessee. The Tennessee Supreme Court established the standard applicable at that time in *Baxter v. Rose,* 523 S.W.2d 930 (Tenn.1975). In *Baxter,* the court stated that attorney competence would be measured under the "duties and criteria" set forth in *United States v. DeCoster,* 487 F.2d 1197 (D.C.Cir.1973); the Sixth Circuit standard established in *Beasley v. United States,* 491 F.2d 687, 696 (6th Cir.1974); and the American Bar Association Standards relating to the Administration of Criminal Justice, particularly those portions of the Stan-

dards relating to the "Defense Function." *Baxter,* 523 S.W.2d at 936.

The *Baxter* court therefore adopted the Sixth Circuit's requirement that defense counsel perform at least as well as a lawyer with ordinary training and skill in the criminal law; conscientiously protect his client's interest, undeflected by conflicting considerations; and investigate all apparently substantial defenses available to the defendant and assert them in a proper and timely manner. *See Beasley,* 491 F.2d at 696, *cited in Baxter,* 523 S.W.2d at 935. Moreover, the court adopted the following explanation of counsel's duties from *DeCoster:*

> Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed.... [T]he adversary system requires that "all available defenses are raised" so that the government is put to its proof. This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the duty to investigate also requires adequate legal research.

*Baxter,* 523 S.W.2d at 933 (citing *DeCoster,* 487 F.2d at 1204 (citation omitted)).

In the present case, the record is clear that Brackstone repeatedly failed to perform at least as well as a lawyer with ordinary training and skill in the criminal law. A lawyer with ordinary training and skill in the criminal law would have taken steps to: (1) form a meaningful and close working relationship with the client; (2) interview the client carefully and independently investigate all circumstances of the case; (3) communicate to the client all evidence against him; (4) determine statutory and non-statutory mitigating circumstances and prepare witnesses properly before they testify; (5) file meaningful pre-trial motions; and (6) object throughout the proceeding in an effort to protect the record against procedural default or waiver.

(1)–(2) Mr. Brackstone failed to form any kind of working relationship with his client and failed to investigate any of the circumstances of the case. Mr. Brackstone first met Mr. Groseclose in the Shelby County jail some time after his arrest. (PC Tr. 199–200). At that first meeting, attorney Brackstone told Mr. Groseclose that he was going to investigate the case. (PC Tr. 200). The next time attorney Brackstone and subsequent times that attorney Brackstone saw Mr. Groseclose he never said and never reported what, if anything, he investigated or what his results were. (PC Tr. 200–201). Mr. Groseclose consistently advised his trial attorney, Mr. Brackstone, that he was innocent and did not commit the crime in question. (PC Tr. 255). However, Brackstone frequently told Mr. Groseclose that he should just plead guilty and throw himself on the mercy of the court. (PC Tr. 201–202).

(3) Mr. Brackstone also failed to communicate to his client all the evidence against him. Petitioner Groseclose testified that attorney Brackstone claimed that the evidence the State was going to present was a box of baby's toys and a refrigerator and things that had absolutely nothing to do with the case whatsoever and that that was all they had. (PC Tr. 212). Brackstone failed to describe the nature of any investigative results to his client. Attorney Brackstone simply failed to describe the evidence against Mr. Groseclose to Mr. Groseclose. (EH Tr. 224). As attorney Brackstone admitted in his post-conviction testimony, the most he ever said about this to Mr. Groseclose was to the effect that the state had "a lot of evidence." (EH Tr. 224). Attorney Brackstone admitted that he did not send any correspondence about the case to Mr. Groseclose. (EH Tr. 224). Attorney Brackstone failed to keep open communication with Mr. Groseclose. (EH Tr. 246).

(4) Mr. Brackstone also failed to determine statutory and non-statutory mitigating circumstances and failed to prepare witnesses properly before they were called to testify. In fact, Mr. Brackstone failed to call many witnesses who could have been proved to be very beneficial to Mr. Groseclose. The quality of the representation afforded during the penalty stage of Petitioner's trial must be considered in light of the United States Supreme Court holding that "in capital cases it is constitutionally required that the sentencing authority have information sufficient to enable it to consider the character and individual circumstances of the defendant prior to the imposition of the death sentence." *Gregg v. Georgia*, 428 U.S. 153, 189 n. 38, 96 S.Ct. 2909, 2932 n. 38, 49 L.Ed.2d 859 (1976).

■ The primary responsibility for insuring that these mitigating considerations are presented to the sentencing authority falls squarely upon defense counsel. A substantial failure to offer such information plainly constitutes ineffective assistance of counsel. *See Mason v. Balcom*, 531 F.2d 717 (5th Cir.1976); *United States v. Pinkney*, 551 F.2d 1241 (D.C.Cir.1976). Even in non-capital cases, counsel has a constitutional obligation to present evidence to the sentencing authority of all relevant mitigating circumstances such as the background and character of the defendant. Mr. Brackstone did not call a single witness or put on any proof during the guilt phase and waived his closing argument. (EH Tr. 188; Closing Arg. Tr. 27). He then failed to present any proof of Mr. Groseclose's conduct in the jail awaiting trial (EH Tr. 112); failed to interview or call other family members to testify (EH Tr. 112); failed to introduce Mr. Groseclose's military records (EH Tr. 112); failed to call expert witnesses to testify (EH Tr. 112); failed to call witnesses concerning Mr. Groseclose's religious activities and church attendance (EH Tr. 112–113); and failed to put on proof about Mr. Groseclose's volunteer activities in the community. (EH Tr. 113). Mr. Groseclose specifically suggested to attorney Brackstone that a minister should be called to testify, but attorney Brackstone did not do so. (PC Tr. 203–204). Mr. Groseclose was licensed as an ordained minister in the Church of God in Memphis and yet Reverend Gladys Adams who is the General Overseer of the Church of God in Memphis and who today acts as the chief religious and administrative officer of that church was never called to testify. (EH Tr. 16, 19). Rev. Adams ministered to Mr. Groseclose weekly while in jail, introduced herself to Mr. Brackstone at trial, and was available to testify but

was never called. (EH Tr. 17, 19–20). Attorney Brackstone could also have called other ministers and religious authorities such as Bishop Kenneth L. Carder of the Methodist Church and the Reverend Joseph Ingle. Yet, he failed to do so.

(5) Mr. Brackstone failed to file meaningful pre-trial motions. The Supreme Court has stated repeatedly that the pretrial phase of a criminal defense is "perhaps the most critical period of the proceedings," a time when "consultation, thorough-going investigation and preparation are vitally important." *Powell v. Alabama*, 287 U.S. at 45, 57, 53 S.Ct. 55, 59–60, 77 L.Ed. 158 (1932); *accord e.g., Von Moltke v. Gillies*, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948). The rationale for this assertion is fundamental: "any experienced trial lawyer knows that a purported trial without adequate pretrial preparation amounts to no trial at all." *Brooks v. Texas*, 381 F.2d 619, 624 (5th Cir.1967). Effective counsel would raise all matters that he or she legitimately could pre-trial. (EH Tr. 238). Mr. Brackstone only filed five pre-trial motions is a case where normally effective counsel would have filed thirty-five to fifty pre-trial motions. (EH Tr. 216). The five pre-trial motions that were filed did not relate to matters of substance and did not challenge the then-new death penalty statute in Tennessee. There was no *Brady* motion filed. (EH Tr. 216). Mr. Brackstone's lack of ability and ineffectiveness was also proved by his failure to make timely pretrial motions to sever Petitioner's trial, or objecting to procedures in voir dire and jury selection.

(6) Mr. Brackstone also failed to object throughout the proceeding in an effort to protect the record against procedural default or waiver. Of the 2,400 pages of actual trial testimony, attorney Brackstone made only one independent trial objection and repeatedly failed to join in other defense objections. (EH Tr. 218).

The record clearly indicates that Mr. Brackstone failed to conscientiously protect his client's interests, undeflected by conflicting considerations. This is clearly shown in Mr. Brackstone's reliance upon Mr. Livingston to the detriment of Mr. Groseclose. Mr. Brackstone told Petitioner Groseclose that Mr. Livingston was the lead counsel for the defense and that he was just going to follow him, which is exactly what Mr. Brackstone did. (PC Tr. 214). Petitioner Groseclose never agreed to this arrangement. Mr. Groseclose did not hire Mr. Livingston, he hired Mr. Brackstone. (PC Tr. 214). Attorney Brackstone himself admitted that he worked as a team with Livingston and decided Livingston would be lead counsel. (PC Tr. 379). Attorney Brackstone also relied upon attorney Livingston with regard to evidence for mitigation. (PC Tr. 388).

In short, Mr. Brackstone basically did whatever Mr. Livingston did to represent his client. (Groseclose Dep. at 29–30). He followed Mr. Livingston's lead. (EH Tr. 113, 292). That is, he virtually deferred to or turned nearly everything over to Livingston. (Groseclose Dep. at 37). Mr. Fels testified that there was no reasonable possibility of a unified defense or simply following the lead of attorney Livingston in this case because attorney Brackstone's overriding mission should have been to perfect the interests of his own client. (EH Tr. 217–218). This was a case where attorney Brackstone should have assumed that the co-defendant's interests were hostile because of the statements they had given. (EH Tr. 241). By looking to attorney Livingston, attorney Brackstone abdicated responsibility for his own client. (EH Tr. 218). The performance of attorney Livingston in this same 1978 trial has already been ruled by this Court as failing to comply with constitutional requirements. *Ronald Eugene Rickman v. Michael Dutton*, 854 F.Supp. 1305 (M.D.Tenn.1994).[4]

■ Mr. Brackstone failed to investigate apparently substantial defenses available to defendant and assert them in a proper and timely manner. In fact Mr. Brackstone failed to conduct any meaningful investiga-

---

4. The Court notes that it has taken judicial notice of the *Ronald E. Rickman v. State of Tennessee* post-conviction proceedings and the proceedings in *Ronald Eugene Rickman v. Michael Dutton*, 854 F.Supp. 1305 (1994), United States District Court for the Middle District of Tennessee. *See* Doc. No. 169.

tion whatsoever—factual or legal. He failed to interview the Government's witnesses as well as his own. Counsel is ineffective "if he fails to investigate sources of evidence which may be helpful to the defense." *Davis v. Alabama*, 596 F.2d 1214, 1227 (5th Cir.1979). It is the duty of counsel to interview potential witnesses and to make independent examination of the factual circumstances involved. *Rummel v. Estelle*, 590 F.2d 103 (5th Cir.1979) and *Bell v. Georgia*, 554 F.2d 1360 (5th Cir.1977) where a habeas corpus was granted solely on defense counsel's failure to make "any effort to contact" critical witnesses or "otherwise undertake any independent investigation." *Id.* at 1361.

In the present case, the record is replete with examples of Mr. Brackstone's failure to investigate and make an independent evaluation. Trial counsel Brackstone received numerous suggestions from Petitioner of witnesses who should be interviewed or incidents which should be investigated and of evidence which should be obtained in order to prepare for Petitioner's defense. Trial counsel Brackstone noted each of these suggestions dutifully and informed petitioner that he would take care of it. Only when this matter was brought to trial, did Petitioner learn to his dismay that the purported investigations and interrogations conducted by trial counsel Brackstone had been in fact neglected and forgotten. None of the witnesses suggested by the Petitioner nor evidence requested by the Petitioner was presented by Mr. Brackstone in the Petitioner's defense.

During the course of the trial, Brackstone proved his lack of preparation, investigation and ineffectiveness by the conduct of the trial. Mr. Brackstone failed even to develop a theory of defense. When asked at the post-conviction hearing about his theory of defense, Brackstone could only say, "My theory was to do the best I could with what I had." (EH Tr. 226–227). At another point, attorney Brackstone says he tried to show that Mr Groseclose "was not there" which was an issue that was never in dispute and only served to support the prosecution's theory. (EH Tr. 227).

Brackstone also exhibited to Petitioner a fundamental lack of knowledge of the bifurcated trial procedure whereby Petitioner was to be tried. Mr. Brackstone informed Petitioner that there would be two stages to the trial. The first stage was solely for the state to put on all their evidence and the second was for the Petitioner to have the opportunity to put on all his evidence. What trial counsel Brackstone was referring to in this fashion was the guilt phase and the penalty phase of Petitioner's capital trial. This in fact was the way trial counsel Brackstone conducted himself throughout the course of the trial in that he presented no witnesses whatsoever during the guilt phase of the trial and only produced five witnesses including the Petitioner during the penalty phase of the trial.

In addition, trial counsel Brackstone displayed a lack of fundamental understanding of the nature of the process of filing objections and motions when he dismissed his failure to join in with other defense motions and objections by saying "Livingston (meaning Robert Livingston trial counsel for defendant Rickman) has already taken care of that."

Mr. Fels reviewed the 2,400 page transcript of Petitioner Groseclose's trial (EH Tr. 213), and concluded that in all of these critical areas, trial attorney Brackstone's legal representation was constitutionally deficient. (EH Tr. 215–216). Attorney Brackstone failed to perform as a reasonably effective attorney in almost every area.

Likewise, the Court finds that Brackstone failed to investigate, prepare, and present a defense for Groseclose. Brackstone failed to investigate or even recognize the defenses potentially available to Groseclose. The Court concludes that such failures by trial counsel "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064, and establish that counsel was deficient under the first prong of the *Strickland* test.

*2. Prejudice*

■ In order to prevail on his ineffective assistance of counsel claim, Groseclose must demonstrate as well that counsel's deficiencies prejudiced the defense so as to deprive

the defendant of a fair trial. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. The Court recognizes, however, that there are certain situations in which it is unnecessary to demonstrate "prejudice" in order to prove ineffective assistance of counsel. *See United States v. Cronic,* 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984). For example, "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* Where counsel thus "fail[s] to function in any meaningful sense as the Government's adversary," *Id.* at 666, 104 S.Ct. at 2051, prejudice is presumed. *Id.* at 659, 104 S.Ct. at 2047.

■ Functionally, a defendant may be totally denied counsel even though his attorney is physically present during the proceedings. *Lombard v. Lynaugh,* 868 F.2d 1475, 1480 (5th Cir.1989) (citing *Cronic* for proposition that constructive denial of counsel is also presumptively prejudicial). Counsel is required to remain an "active advocate," *Evitts v. Lucey,* 469 U.S. 387, 394, 105 S.Ct. 830, 835, 83 L.Ed.2d 821 (1985), and observe a duty of "zealous and loyal representation," *Nix v. Whiteside,* 475 U.S. 157, 188, 106 S.Ct. 988, 1005, 89 L.Ed.2d 123 (1986). *See also United States v. Swanson,* 943 F.2d 1070, 1075 (9th Cir.1991) (defense counsel's actions in assisting the prosecutor constituted abandonment of counsel's duty of loyalty to client and created conflict of interest). Notably, "attorneys who adopt the role of the judge or jury to determine the facts pose a danger of depriving their clients of the zealous and loyal advocacy required by the Sixth Amendment." *Nix,* 475 U.S. at 189, 106 S.Ct. at 1005 (citation omitted).

The Tenth Circuit thus recognized that "an attorney who adopts and acts upon a belief that his client should be convicted fails to function in any meaningful sense as the Government's adversary." *Osborn,* 861 F.2d at 625 (citing *Cronic,* 466 U.S. at 666, 104 S.Ct. at 2051). The *Osborn* court specifically criticized counsel for making statements to the press about his client which "could easily have come from the prosecutor, rather than defendant's counsel," *Id.* at 628, and warned that "an attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants because the interests of the state and the defendant are necessarily in opposition." *Id.* at 629.

Mr. Brackstone failed to remain an active advocate who observed a duty of zealous and loyal representation of his client and thereby deprived Mr. Groseclose of a fair trial by: (1) failing to subject the prosecution's case to meaningful adversarial testing, and (2) failing to function in any meaningful sense as the Government's adversary.

Mr. Brackstone did not ask for an on the record hearing about the medication (EH Tr. 111); did not file the kind of pretrial motions that a reasonably effective attorney would (EH Tr. 111–112); failed to order the entire trial transcript (EH Tr. 112); failed to present any proof of Mr. Groseclose's conduct in the jail awaiting trial (EH Tr. 112); failed to interview the crime incident witnesses such as Aline Davis, Pam Baker, Sgt. Childers, and others (EH Tr. 186); failed to interview or call other family members to testify (EH Tr. 112); failed to introduce Mr. Groseclose's military records (EH Tr. 112); failed to call expert witnesses to testify (EH Tr. 112); failed to call witnesses concerning Mr. Groseclose's religious activities and church attendance (EH Tr. 112–113); failed to put on proof about Mr. Groseclose's volunteer activities in the community (EH Tr. 113) and generally just followed in the footsteps of and did whatever attorney Livingston did. (EH Tr. 113). Attorney Marett testified that Mr. Groseclose's trial was prejudiced because of these failures and because of attorney Brackstone having no theory of the case as to a defense. (EH Tr. 114). Again, Mr. Brackstone did not call a single witness or put on any proof during the guilt phase and waived his closing argument. (EH Tr. 188).

Attorney Charles Fels testified that the major problems and major failures of attorney Brackstone resulting in prejudice were the failure to investigate: attorney Brackstone's investigation was perfunctory, involved very limited work, and resulted in attorney Brackstone being "astonished" to

have Mr. Groseclose's first statement introduced into evidence because he had "simply forgotten that he had seen it before." (EH Tr. 222–223). There was a failure to investigate because attorney Brackstone never interviewed witnesses that concerned the co-defendants who had given incriminating statements against Mr. Groseclose. (EH Tr. 223).

According to Fels, another major element of prejudice at the trial was attorney Brackstone's performance at the sentencing phase. Attorney Brackstone apparently did not comprehend how the mitigation hearing was supposed to be conducted. Again he relied upon Mr. Livingston who represented a defendant with very different interests. He called four witnesses, all of whom cumulatively hurt, not helped the Petitioner. (EH Tr. 229–230). Attorney Brackstone did not call Mr. Groseclose as a witness during the guilt phase, which he could have done since Mr. Groseclose repeatedly told him he was innocent and Mr. Groseclose did not have a criminal record. (EH Tr. 232).

Attorney Brackstone instead called Mr. Groseclose to testify at the mitigation stage and the first evidence he elicited was to have Mr. Groseclose deny the Jury's finding of guilt which was counter-productive and possibly even offensive to the Jury. (EH Tr. 232). Attorney William Marett testified that " . . . in effect, we are telling the Jury, 'we don't accept what you have done, you have made the wrong decision.' You are starting off with [the] wrong foot with the Jury." (EH Tr. 95–96). Petitioner Groseclose was prejudiced by the failure of his lawyer to have any comprehensive idea of what that testimony might mean at either phase and why if it were to be called upon it would make sense to call upon it first rather than second. (EH Tr. 253).

According to Fels, the next failure that prejudiced Mr. Groseclose was attorney Brackstone's failure to have the court reporter transcribe the closing arguments. This was especially prejudicial since the prosecutor made references in his final argument in the penalty phase about the possibility of parole on a life sentence. (EH Tr. 253–255; EH Tr. 105–106). This was clearly error and

later a member of the Jury asked a question that related directly to it. (EH Tr. 255).

There was also a failure of trial counsel with respect to cross-examination of witnesses generally. In addition to the above examples, Mr. Brackstone only cross-examined 17 of the 39 or 40 witnesses called by the State. (EH Tr. 228). Some of these witnesses were important and critical such as the mother of the victim and Mr. Taylor and Mr. Shanks who were invited to participate in the murder. (EH Tr. 228–229). As to Mr. Mount who was the most critical witness, attorney Brackstone only cross-examined him for eleven pages in what attorney Charles Fels described as "a remarkably limited effort for a critical major witness against your client." (EH Tr. 228). In fact, attorney Charles Fels noted that at one point the District Attorney objected to attorney Brackstone's cross-examination as being "trivial." (EH Tr. 251). Overall, Brackstone's cross-examination during the guilt phase testimony totaled 75 pages of transcript out of 1,600 pages. (EH Tr. 228).

Another major failure that prejudiced Mr. Groseclose was attorney Brackstone's failure to develop a theory of defense. As attorney Charles Fels testified, the "key to criminal defense" is to assess the nature of the evidence, make an independent investigation and decide on the basis of all the facts what the defendant's best position is in terms of either making certain admissions and seeking to mitigate them or deciding to deny them entirely. (EH Tr. 226). The reasonable and usually competent attorney will be able to tell you in a sentence or two just what is the theory of the defense. (EH Tr. 226). Again, attorney Brackstone, when asked at the post-conviction hearing, could only say that his theory was to do the best he could with what he had. (EH Tr. 226–227).

The next major failure by attorney Brackstone that prejudiced Mr. Groseclose concerned the medication administered to Mr. Groseclose. There were numerous areas of prejudice in this matter since such medication could impair the trial attorney's ability to communicate with the client and could have a negative impact on the client's ability to testify. (EH Tr. 224–225). In fact, Mr.

Groseclose did testify at the sentencing phase and was apparently under heavy medication at the time and any professional attorney would want to know what effect that medication had on Mr. Groseclose's appearance, especially as to his credibility in the eyes of the Jury. (EH Tr. 225; EH Tr. 105). A reasonably effective trial lawyer should have investigated what medications his client was taking, especially if it was brought to his client and essentially forced on him by the deputy sheriff. (EH Tr. 103). All of these instances of counsel's deficiencies, *inter alia,* prejudiced the defense so as to deprive Groseclose of a fair trial.

The Court finds that Mr. Brackstone failed to remain an active advocate who observed a duty of zealous and loyal representation of his client and thereby deprived Mr. Groseclose of a fair trial by: (1) failing to subject the prosecution's case to meaningful adversarial testing, and (2) failing to function in any meaningful sense as the Government's adversary as required under the Sixth Amendment. *See Cronic,* 466 U.S. at 659, 104 S.Ct. at 2047; *Osborn,* 861 F.2d at 625. Under the unusual circumstances present in this action, prejudice is therefore presumed. *Cronic,* 466 U.S. at 659, 104 S.Ct. at 2047. The Court concludes that Groseclose received constitutionally ineffective assistance of counsel at both the guilt phase and the penalty phases of trial.

### B.   *Claim 2: Selection of Jury Foreman*

The pivotal question in this matter is whether Petitioner Groseclose, a white male, has standing to raise the issue of racial discrimination based on exclusion of African–Americans and the issue of sexual discrimination based on the exclusion of women. In their answer, the respondent argued that Petitioner Groseclose lacked standing in reliance on *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) and *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

Because Petitioner's conviction has been set aside on other grounds and the Supreme Court has not yet ruled as to whether a defendant must be a member of the excluded group in order to raise a due process claim, the Court declines to render a decision concerning constitutional issues unnecessary to the decision of the case before it. *See Alexander v. Louisiana,* 405 U.S. at 633, 92 S.Ct. at 1227 (1972); *See also Ford v. Kentucky,* 469 U.S. 984, 105 S.Ct. 392, 83 L.Ed.2d 325 (1984).

### C.   *Claim 3:   Cumulative Errors*

■ The Sixth Circuit has recognized that errors which individually might not rise to the level of a constitutional violation may, when considered cumulatively, render a trial fundamentally unfair. *See Lundy v. Campbell,* 888 F.2d 467, 472–73 (6th Cir.1989), *cert. denied,* 495 U.S. 950, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990); *Walker v. Engle,* 703 F.2d 959, 963 (6th Cir.1983), *cert. denied,* 464 U.S. 951, 104 S.Ct. 367, 78 L.Ed.2d 327 (1983).

The Court, in its Order of April 5, 1995 (Doc. No. 184) granting Petitioner summary judgment in part, has found that Groseclose's trial was tainted by several constitutional errors. The Court found that Petitioner was convicted on the basis of the false and misleading testimony of Barton Wayne Mount (*Giglio* and *Brady* violations); was sentenced to death upon the Jury's consideration of unconstitutional jury instructions concerning "heinous, atrocious or cruel" aggravating circumstance, reasonable doubt, and unanimity; suffered an arbitrary review by the Tennessee Supreme Court under the review procedures utilized in Tennessee; suffered a failure to transcribe the closing arguments at trial so as to allow reviewing courts access to the full record on appeal; and was involuntarily and unconstitutionally drugged throughout the trial. Furthermore, the Court now finds that Petitioner was denied constitutionally effective assistance of counsel at the guilt and penalty phases of trial.

The Court concludes that even if any one of the errors found in this case does not individually require that Groseclose be given a new trial, the cumulative effect of the errors violates due process and mandates issuance of the writ.

## III. CONCLUSION

For the above-stated reasons, the Court declines to find that Mr. Groseclose was prejudiced in the selection of a jury foreman (Claim 2). However, the Court does find that Petitioner Groseclose was denied constitutionally effective assistance of counsel at the guilt and penalty phases of trial (Claim 1), and was denied due process at the guilt and penalty phases of trial due to the cumulative effect of the errors committed (Claim 3).

Accordingly, the Court hereby vacates Mr. Groseclose's conviction for first-degree murder. Furthermore, the writ of habeas corpus shall issue, unless within 120 days from the entry of this order the State affords Mr. Groseclose a new trial for first-degree murder.

An Order consistent with the findings herein is filed contemporaneously.

### *ORDER*

In this habeas corpus proceeding under 28 U.S.C. § 2254, Petitioner William Edward Groseclose challenges the constitutionality of his 1978 conviction and sentence of death by electrocution imposed by the Criminal Court of Shelby County, Tennessee. Mr. Groseclose was tried and convicted in February of 1978 for murder in the first degree for the murder of his wife, Deborah Lee Groseclose.

Consistent with the contemporaneously filed Memorandum, the Court DECLINES to find that Mr. Groseclose was prejudiced in the selection of a Grand Jury foreman, but FINDS Petitioner was denied constitutionally effective assistance of counsel at the guilt and penalty phases of trial, and was also denied due process at the guilt and penalty phases of trial due to the cumulative effect of the errors committed.

Accordingly, the Court hereby VACATES Mr. Groseclose's conviction for first-degree murder. Furthermore, the writ of habeas corpus shall ISSUE, unless within 120 days from the entry of this order the State affords Mr. Groseclose a new trial for first-degree murder.