IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 27, 2004

## CLYDE DEWAYNE WESEMANN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Sullivan County**
**No. C42-486      Richard R. Vance, Judge**

_____

**No. E2003-02256-CCA-R3-PC - Filed January 4, 2005**

_____

The petitioner, Clyde Dewayne Wesemann, appeals the dismissal of his petition for post-conviction relief from his convictions for first degree murder, aggravated burglary, and theft of property under $500, arguing that the post-conviction court erred in finding that he received effective assistance of trial counsel. After a thorough review of the record, we affirm the dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and J. C. MCLIN, JJ., joined.

Susanna L. Thomas, Newport, Tennessee, for the appellant, Clyde Dewayne Wesemann.

Paul G. Summers, Attorney General and Reporter; Michael Markham, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Barry Staubus, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

        The facts of this case were set out in the opinion of this court on direct appeal, affirming the petitioner's convictions:

> On June 11, 1992, at approximately eight p.m., Mrs. Virginia Trusley was found dead in the living room of her home in rural Sullivan County. The house had been ransacked and Mrs. Trusley had apparently been shot as she dozed in front of the television with her Bible open on her lap.

Very quickly, suspicion centered upon [the petitioner], who had mowed Mrs. Trusley's yard. [The petitioner's] girlfriend led police to an out-of-the-way bridge under which she had watched [the petitioner] hide the murder weapon, which had been stolen from the home of the deceased. When brought in for questioning, [the petitioner] confessed to this crime.

In his confession, [the petitioner] stated that he entered the house about five a.m. on the day that the body was discovered by breaking the glass in a back door. He searched the kitchen but found nothing which he considered worth taking. [The petitioner] then walked down the hall to the bedroom. First searching the closet, he found a .410 shotgun. Upon discovering the shotgun, [the petitioner] walked back up the hall to the living room where Mrs. Trusley was sleeping. He aimed the shotgun at her and pulled the trigger. The shot entered Mrs. Trusley's temple, instantly killing her. [The petitioner] stated that the shot surprised him because he "didn't know for sure" that the gun was loaded. [The petitioner] stated that he immediately regretted what he had done. After killing Mrs. Trusley in her sleep, [the petitioner] resumed searching the house. After the search, he left with the only possession of the deceased which he considered valuable, the shotgun.

After leaving the house, [the petitioner] then went home and went to bed. The following day, [the petitioner] talked to several people about selling the shotgun. The police questioned [the petitioner] briefly but he denied any knowledge of the murder. The following day, [the petitioner] learned that the police were again searching for him. Since [the petitioner's] car would not start, he called his girlfriend who drove him to the Sensabaugh Hollow bridge where he hid the shotgun.

State v. Clyde Dewayne Wesemann, No. 03C01-9404-CR-00144, 1997 WL 348869, at *1 (Tenn. Crim. App. June 25, 1997), perm. to appeal denied (Tenn. Mar. 2, 1998). The petitioner was sentenced to life imprisonment for the first degree murder conviction, ten years for the aggravated burglary, and eleven months, twenty-nine days for the theft conviction. The burglary sentence was ordered to be served consecutively to the life sentence.

On March 3, 1999, the petitioner filed a *pro se* petition for post-conviction relief,[1] asserting ineffective assistance of counsel and the following as grounds for relief: (1) "counsel failed to properly investigate the facts of his case with regard to witnesses, statements and innocences [sic] as provided by petitioner to counsel;" (2) "counsel failed to properly consult with the petitioner about vital trial strategies concerning calling of witnesses which could change the outcome of the jury verdict;" (3) "counsel failed to put on a defense thus allowing the State's case against petitioner to go unchallenged;" and (4) "counsel was ineffective due to his lack of ability in defending a death penalty case." Counsel was appointed, an amended petition was filed, and an evidentiary hearing was held.

Although the petitioner testified as the second of two witnesses at the evidentiary hearing, we will briefly summarize his testimony first. He said he gave trial counsel the name of a "lady that was a neighbor of [his]" to corroborate that he had asked for assistance in getting his car started the morning of the crimes. He stated he was told that "she wasn't a good witness," and she was not called to testify. No other witnesses existed to place him at his home at the time of the murder. Trial counsel located and questioned "Waldo," the person whom the petitioner said gave him the shotgun. However, Waldo "denied everything." According to the petitioner, the decision was made that he would not testify because he would be "discredited" by prior convictions. The petitioner admitted giving the confession to police and said he had an explanation for why he gave the statement, but the jury never heard his explanation. He did not say that he had wanted to testify at his trial, however.

Trial counsel testified that he had practiced law for twelve years before becoming a public defender in 1989. He had attended numerous capital defense seminars and, as a public defender, had been involved in other capital murder cases. At the time of the hearing, he was certified as a death penalty lawyer, and he testified that, had the certification process existed at the time of the trial, he would have qualified then as well. Trial counsel said he was the lead attorney on the case, and the trial court appointed an attorney in private practice as co-counsel. Trial counsel consulted at least two experts during preparation for the petitioner's trial, and other preparation for the case involved travel to Texas, Florida, Illinois and "various states." Based on the evidence, the defense theory developed by counsel in the petitioner's case was "essentially" that "the prosecution hadn't proven deliberation and premeditation beyond a reasonable doubt." He also filed an unsuccessful pretrial motion to suppress the signed confession as being a product of coercion. He also "spen[t] a lot of time" preparing for the mitigation stage of the case, compiling various documents and evidence

---

[1] The State asserted initially that the petition was time-barred by the one-year statute of limitations in Tennessee Code Annotated section 40-30-202(a). The petitioner responded that he placed the petition in the prison mail deposit box on February 25, 1999, within the one-year limitation, and the record reflects that the "Affidavit of Indigency," filed the same date as the petition and signed by the petitioner, was notarized on February 25, 1999. The post-conviction court allowed the petitioner to proceed with his petition, finding that the "petition present[ed] a colorable claim." Because the State does not challenge this determination by the post-conviction court on appeal, we do not find it necessary to address whether the petitioner met his burden of demonstrating that he timely filed his petition within the one-year statute of limitations. See Neely v. State, 34 S.W.3d 879 (Tenn. Crim. App. 2000); Karl Hamilton v. State, No. W1999-01793-CCA-R3-PC, 2000 WL 72043 (Tenn. Crim. App. Jan. 25, 2000).

relating to the petitioner's "horrendously abusive life and childhood." During the preparation for the trial, trial counsel consulted with the petitioner "on a regular basis," and both he and his investigator "went to visit him several times." Additionally, an employee in the office was assigned to contact the petitioner by telephone every day. The defense team located several people the petitioner indicated could help his defense, including the person who supposedly gave him the shotgun, as well as several alibi witnesses. However, none were called to testify because they either "contradicted" the petitioner or did not provide helpful alibi testimony. Asked about physical evidence at the scene of the crime, he said he investigated all aspects of the case and concluded that much of the physical evidence was corroborated not only by the petitioner's confession to police, but also by further investigation by the police and independent investigation by defense counsel. By focusing on the petitioner's "severe mental illness" and abusive childhood at the mitigation stage of the trial, trial counsel was able to obtain a "unanimous life sentence" for the petitioner rather than the death penalty. Trial counsel said he was proud of the work done on the case, and none of his training and experience in the ten years since the case had lead him to believe that anything should have been done differently.

At the conclusion of the hearing, the court made lengthy and detailed oral findings of fact and conclusions of law and dismissed the petition, finding that the petitioner had failed to sustain his burden of demonstrating that counsel had been ineffective. Since the post-conviction court announced its findings at the conclusion of the hearing, there are no written findings in the technical record. Following a post-conviction hearing, a trial court is required to enter written findings of fact and conclusions of law addressing all grounds for relief. See Tenn. Code Ann. § 40-30-111(b) (2003); Tenn. Sup. Ct. R. 28, § 9(A). Nevertheless, the trial court's oral pronouncement of its findings from the bench does not necessarily require reversal and can be harmless error. See State v. Higgins, 729 S.W.2d 288, 290-91 (Tenn. Crim. App. 1987). Here, the post-conviction court's findings and conclusions are sufficiently comprehensive to allow for proper appellate review; hence, the failure to enter written findings and conclusions was harmless. Tenn. R. App. P. 36(b).

## ANALYSIS

### Standard of Review

The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction

court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns, 6 S.W.3d at 461.

## Ineffective Assistance of Counsel

The argument that the petitioner presents on appeal is whether the post-conviction court erred in finding that he received effective assistance of counsel. In order to establish this claim, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

Because both prongs of the test must be satisfied, a failure to show either deficient performance or resulting prejudice results in a failure to establish the claim. See Henley, 960 S.W.2d at 580. For this reason, courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim"). If the petitioner fails to meet either prong of the Strickland test, his claim of ineffective assistance of counsel must fail.

The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct.

at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

In his brief on appeal, the petitioner argues that trial counsel were ineffective by failing to properly investigate the facts of his case and failing to consult with him concerning various decisions related to trial strategy, including the defense theory, the calling of alibi witnesses, and the petitioner's potential testimony explaining his confession. The petitioner contends that he should have been allowed to testify and explain why he confessed to the crime, and that trial counsel failed to put on an adequate defense by not presenting certain factual matters to the jury.

The problem with raising these allegations on appeal is that the petitioner presented no proof at the evidentiary hearing as to any of them, although he did briefly describe two potential witnesses who did not testify at the trial or the evidentiary hearing. Additionally, he testified that he and trial counsel had "discuss[ed]" whether he would testify at trial and he understood "because of prior convictions [he] would be discredited." He claimed to have learned only at the evidentiary hearing that "you could get on the stand and not have [a] prior record be used against you." Although he agreed, in response to his attorney's questions, that he had an explanation as to why he confessed to the crimes, he did not claim that he had wanted to testify at his trial.

Before reviewing the individual complaints made by the petitioner against his trial counsel, we will set out the details of the petitioner's confession to the crimes:

> [The petitioner's] statement indicated that he approached Deceased's home about five a.m. and found her asleep in a chair in the living room (she could be seen from the door). Entry was accomplished by forcing a screen door and breaking the glass in the door. In his signed statement, [the petitioner] states that he does not remember what he used to break the glass but police notes of the statement reflect that [the petitioner] said a garden tool container was used. The physical evidence indicates that it may have been a can of paint, the top of which came loose during the process. After entry, [the petitioner] determined that the deceased remained asleep.
>
> . . . .
>
> The signed statement then reflects that [the petitioner] opened the back door and went into the kitchen. He then searched all of the

kitchen cabinets but failed to find anything which he considered worth taking. [The petitioner] then walked past the deceased into the bedroom. He looked into the closet and found the .410 shotgun. [The petitioner] took the shotgun, walked back up the hall to the living room where the deceased was asleep, aimed the shotgun at her and pulled the trigger. In his signed statement, [the petitioner] stated both that he did not know "for sure that the gun was loaded" and that he "figured the gun was loaded" because count[r]y people often keep a gun loaded so that it may be used quickly, if needed. In his statement, [the petitioner] stated that he "immediately regretted shooting her". If this is true, subsequent facts give no indication of it. After killing the deceased in her sleep, [the petitioner] searched the living room, then returned to the kitchen where he searched a hutch. He then returned to the bedroom from whence he had taken the shotgun and searched that room, including the closet where he had found the gun. Upon concluding his search and finding nothing which he considered valuable, [the petitioner] returned to the kitchen and used a towel to wipe the house for fingerprints. He then took the shotgun and left the house. After trying to sell the shotgun, [the petitioner] disposed of it under a culvert when he heard that the police had asked about him.

. . . .

In his signed statement, . . . [h]e stated that it surprised him when the gun went off. [The petitioner] gave as the reason for his action, "I shot her because I never killed anyone before." A note to his statement, which was not signed by [the petitioner] but was presented to the jury added the phrase, ". . . and I wanted to know what it felt like."

Clyde D. Wesemann, 1997 WL 348869, at **3-5. The petitioner's girlfriend led police to the rural location where the petitioner had disposed of the murder weapon. At the evidentiary hearing, the petitioner did not explain what he would have told the jury about this confession had he testified at his trial, what he would have said about his girlfriend's testimony, or what he would have said about others seeing him after the crimes with the stolen shotgun.

The petitioner asserts in his brief that "counsel failed to properly investigate the facts of his case," citing Groseclose v. Bell, 895 F. Supp. 935 (M.D. Tenn. 1995), aff'd, 130 F.3d 1161 (6th Cir. 1997). He did not testify at the hearing as to this claim; and the proof presented as to it, the testimony of trial counsel, shows just the opposite. Here, the petitioner's two attorneys and their investigator worked for over a year investigating the petitioner's case, including locating and interviewing the petitioner's girlfriend, various purported "alibi" witnesses, at least two experts, as

well as finding "Waldo." Trial counsel testified that they considered various defenses, filed multiple motions, vigorously questioned the State's witnesses, and represented the petitioner at trial as best they could. The post-conviction court determined that the petitioner failed to prove this claim, and we concur.

On appeal, the petitioner argues that his trial counsel "failed to put on a defense" although he did not testify at the hearing as to this claim. Asked what defense theory they developed on behalf of the petitioner, trial counsel explained that they had focused on demonstrating that the State had failed to prove premeditation and deliberation beyond a reasonable doubt, as well as mitigating evidence at the sentencing phase of the trial:

> Well, the defense theory basically was that we had investigated, to the best of our ability, defenses that would have exonerated [the petitioner], and did not find that there was sufficient evidence to proceed that way. The evidence just wasn't shaping up that way.
>
> We were then faced with the dilemma that common – that is common in capital cases; that is, you're going to have two trials before the same jury. If you take a position that the jury might find to be . . . irrational or unreasonable in the jury trial, they may not believe anything you say, and that – and you may lose all credibility at the sentencing trial.
>
> So the way we tried the case essentially was, without conceding anything, was to point out, in our opinion, that the prosecution hadn't proven deliberation and premeditation beyond a reasonable doubt. That was essentially the defense in the case. We tried to hit at those issues which we thought there was a better chance of a verdict of less than first degree murder.

The only proof presented as to this claim was the testimony of trial counsel, who denied it. The record supports the finding of the post-conviction court that the claim is without merit.

Likewise, as to the claim on appeal that counsel failed to consult with the petitioner about the trial, the only testimony was that of trial counsel. Questioned about his consultations with the petitioner, counsel said that he frequently discussed the case with him:

> We consulted with him on a regular basis. I went to visit him, the investigator went to visit him several times. But, in addition to that, we had an employee in our office assigned to speak with him every day, and they were in telephone contact. This was a non-lawyer, but still a person he had[.]

As we have said, the testimony of the petitioner at the evidentiary hearing is vague as to whether he wanted to testify at the trial. We cannot determine, from his affirmative responses to post-conviction counsel's remarks that "the jury never heard [the petitioner's] explanation" as to confessing to the crimes and "never knew that [the petitioner] denied pulling the trigger and killing [the victim]," whether they were statements of fact or claims that he had wanted to testify. The petitioner and counsel discussed whether he would testify, and, as trial counsel testified at the hearing, the decision was made by the petitioner and counsel that he would not:

> Q. And, again, did you discuss with him the pros and the cons to testify?
>
> A. We did.
>
> Q. And was that [the petitioner's] decision to make?
>
> A. Was . . .
>
> Q. Did [the petitioner] ultimately have to make that decision whether to testify or not?
>
> A. Well, he didn't disagree with us. I mean, we told him what our feeling was, and he didn't insist that he testify or insist that a particular witness be called or anything of that nature.
>
> Q. All right. And you also discussed your defense with him, as well, and you told him the problems with his statement and why it would be difficult to pursue any other defense than that, that it wasn't a deliberative act? That's what you . . .
>
> A. Yeah. I mean, we talked about it. I don't know if in exactly those words. But, yes.

Asked to explain why they felt it would not be helpful for the petitioner to testify and claim he was innocent, trial counsel said it was in large part due to the petitioner's incriminating confession, which the trial court, and this court on appeal, determined to be admissible:

> Well, you know, the evidence seemed pretty overwhelming to us. Number one, he'd given a statement which we were unable to suppress. Number two, there was other corroborating evidence. If he testified, I think it would have opened up other – caused other problems. It would have undoubtedly broadened the scope of the

evidence that could have been admitted against him; specifically, the – probably the earlier theft would have probably become relevant during cross-examination.  And, well, another reason is we didn't think he would be a good witness for himself.  Our expert witness diagnosed him as having a serious mental illness.  And we had great concerns in that regard about his ability to testify.

So, you know, the problem again in capital cases is if you have a client who's facing death, if you have a strong defense, that's the best thing to present.  Obviously if you can get acquitted or get a reduced charge, then you don't face the death penalty.  But frequently in death penalty cases, they're pretty strong cases or they wouldn't have filed a death notice.  And if one unreasonably persists in one's innocence, we were concerned, also, about the effect on the sentencing hearing in that regard, that we would not be very credible to a sentencing jury.  So there were a variety of reasons why that decision was made.

Q.     Okay.  So are you saying that the defense team made the decision that if [the petitioner] persisted in saying he was innocent and the jury perceived that as unreasonable, that they would hold that against him in the sentencing phase?

A.     We pointed out that's a possibility, along with the other problems.

Q.     Okay.  Was one of the problems his prior record?

A.     Well, that – I don't remember much about his prior record.  I don't recall it was all that – I guess that's – that would – I mean, I really – remember he had some prior record.  That would have been, I guess, somewhat problematical, I guess.

The post-conviction court found that counsel adequately consulted with the petitioner and put on an adequate defense:

[T]hat counsel failed to consult with [the petitioner] about the important decisions to be made in the case.  To the contrary, the testimony shows there was extensive consultation, not only between the attorneys and [the petitioner], but had even assigned a person in the public defender's office to have daily communication with him.

-10-

That thirdly, that they failed to put on an adequate defense. That is, by not presenting to the jury that [the petitioner] had recanted the statement, which was a major principal piece of evidence against him, or that he – counsel failed to attack the prior convictions.

The presentation of any form of evidence that the [petitioner's] recanted his statement or that it was not true, under the facts and circumstances before the Court, would have required [the petitioner] to have testified in the case-in-chief in order to accomplish that. That presented quite a dilemma for counsel, in that, had he testified, evidence of other previous convictions could have been shown, affecting his credibility, and opened the door to cross-examination, and exposing [the petitioner] to that credibility attack which would have hurt him and hurt the credibility of the defense in the penalty phase of the trial.

The Court has asked questions and observed that the previous convictions that he had were for thefts and burglaries in other cases that, in all probability, would have been introduced against him, had he testified. . . . Quite frankly, there's been nothing shown to the Court today that those convictions would have been excluded. He would have faced those, had he testified.

The defense did focus, in the guilt phase of the trial, on attacking the State's proof with respect to the essential elements of premeditation and deliberation. The record was replete with their – not only in arguments but in their cross-examination, that from the beginning [trial counsel's] opening statements, Volume 2 of the transcript, Pages 140 and 141, emphasize that very issue from the outset. Further, in [trial counsel's] final arguments, in Volume 4, focused on those same issues. Those same issues were argued on appeal unsuccessfully.

. . . .

The choice or decision to not have [the petitioner] testify in the guilt phase of his trial was an important decision. Once the [petitioner's] very detailed statement was admitted into evidence over the objection of [trial counsel], it presented terrible issues for him. It would expose the previous convictions, it would have exposed him to cross-examination about the details of the statement. [Trial counsel] made the right call. To have put the [petitioner] on the stand

at that point in time with the potential for the death penalty would have been devastating to the [petitioner].

> The Court would observe that any counsel representing the [petitioner] at that time should have made the same decision. It's also important to note that during the course of making that decision, that [the petitioner] was consulted. This was gone into between he and his counsel. And [the petitioner] had agreed this was the proper course. And, having reviewed the evidence of the trial, of the case, of the theories, of the various corroborating pieces of evidence, there could have been no other legitimate course of action for the defense than that taken by [trial counsel].

The record fully supports these determinations. We note that when challenging counsel's conduct, a petitioner bears the burden of showing that "*no* competent counsel would have taken the action." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (emphasis added). Here, we simply cannot conclude that *no* competent counsel would have elected to defend these matters as did the petitioner's trial counsel.

As to alibi witnesses, the testimony of both the petitioner and trial counsel agrees that the petitioner provided names of purported alibi witnesses, which counsel followed up on. After interviewing the petitioner's neighbor, his alibi witnesses, and "Waldo," trial counsel explained that none of these witnesses would have been able to provide helpful testimony at trial:

> Q. Okay. Now, you were asked – and I want to get back to the fact that you were asked about calling any other witnesses.
>
> Now, when you spoke to [the petitioner], did he give you a name of anybody that he thought would help assist in the defense of the case?
>
> A. He wanted us – he told us a story about a gentleman named Waldo who had – he told us that's how he had gotten the shotgun.
>
> Q. Okay. Now, through your investigative efforts, were you able to, in fact, locate that man?
>
> A. [Our investigator] did.
>
> Q. Okay. [Your investigator].
>
> A. Yes.

-12-

Q.     Did he interview that man?

A.     Yes, he did.

Q.     What were the results of your investigation?  What did this individual named Waldo, what did he – what information did he give you?

A.     Well, he denied that he had anything to do with the shotgun or any property from the [victim's] residence or – you know, he didn't back up anything.

Q.     So he did not corroborate –

A.     Yeah.

Q.     – what [the petitioner] was telling you?  In fact, he contradicted what [the petitioner] was telling you?

A.     That's correct.

Q.     And that would not have aided in the defense of this case to have called him as a witness and used him?

A.     Not in our opinion.

Q.     Okay.  And did [the petitioner] ever offer any other individuals that could assist in a defense?

A.     No, other than he identified and we tried to find – I think we found most, if not all of them, the people he was with the evening in question.

Q.     Okay.

A.     And we. . .

Q.     But you did not call them as witnesses?

A.     No, they weren't – all they basically said was, "He was at our house.  We were sort of partying.  He later left."

Q.     Right.

A.      But the timing of when he was there would not have created an alibi defense. . . .

We note that none of these potentially helpful witnesses were produced at the post-conviction hearing. As we explained in Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990), this fact precludes relief as to the claim.

As a final argument on appeal, the petitioner asserts that certain factual matters were not presented to the jury by trial counsel, or put another way, that trial counsel failed to properly attack factual matters presented by the State in its case in chief. The post-conviction court found that trial counsel "skillfully" dealt with these factual matters:

> During the course of trial, counsel made timely objections and motions, and preserved all issues with respect to the evidence for appeal; argued that on appeal. Counsel vigorously attacked introduction of the [petitioner's] statements in the motion to suppress; argued that on appeal. The trial transcript shows that counsel skillfully pointed out the inconsistencies, any weaknesses in the evidence, including the fingerprint evidence shown by [trial counsel's] cross-examination of the fingerprint expert, which is shown on – in Volume 3 at Page 270 of the transcript. There was no fingerprint evidence. As pointed out today, that argument is a difficult one to make much out of in view of [the petitioner's] own statement in which he says he wiped all the surfaces which he had touched with a towel, leaving no fingerprints.
>
> They attacked vigorously the testimony of the glass expert, showing some inconsistencies in some of the glass fragments that were found connected with the [petitioner]. They conducted an extensive investigation, background and history of the [petitioner]. They documented his lifetime of abuse. They employed a psychologist to present the evidence of mental illness, a mitigation expert, their own highly experienced investigator. In short, they did everything expected of an attorney in a death penalty case. And, of course, the jury did not return the death penalty, which is to their credit in presenting the defense in the way it was presented.
>
> So the Court must find that the Petitioner has failed to carry his burden of proof, not only by clear and convincing evidence, but by even a preponderance of evidence. In fact, there's not even a breath of evidence in this record to support the contention that [trial counsel] were anything but highly competent and effective in their defense. Shows that [trial counsel] was – zealously and vigorously

-14-

represented the [petitioner]. He was an effective advocate. He tested the State's evidence, attacked the State's theories. He made responsible and correct decisions about trial strategy, consulted with the [petitioner] in every phase. In short, he was diligent, able, and highly effective in representing his client. So, for all these reasons, let the petition be dismissed with cost to the Petitioner.

The evidence fully supports the post-conviction court's findings. Also, in light of the overwhelming proof of the petitioner's guilt, he has failed to demonstrate how, "but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068.

## **CONCLUSION**

We conclude that the petitioner failed to meet his burden of demonstrating that he was denied the effective assistance of trial counsel. Accordingly, we affirm the dismissal of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

-15-